# EXHIBIT 1
# TO DEFENDANT'S MOTION FOR
# SUMMARY JUDGMENT

## Excerpts from 6/14/16 Deposition of
## Lowry Watkins

1           UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF KENTUCKY

3               AT LOUISVILLE

4

5 LOWRY R. WATKINS, JR.

6                            PLAINTIFF

7

8 V.             CIVIL ACTION NO. 3:13-CV-1113-DJH

9

10 PNC BANK, National Association, Individually and In Its

11 Capacity as Trustee of the TRUST UNDER WILL OF

12 WILLIAM MARSHALL BULLITT BY and THROUGH ITS

13 TRUSTEE, PNC BANK, N.A.

14                            DEFENDANT

15 _____

16

17          DEPOSITION FOR THE DEFENDANT,

18             PNC BANK:

19

20    The Deposition of Lowry R. Watkins, Jr., taken in

21 the above-styled matter at Wyatt, Tarrant & Combs,

22 LLP, 500 West Jefferson Street, 2800 PNC Plaza,

23 Louisville, Kentucky, on the 14th day of June, 2016,

24 beginning at 9:00 a.m.

25

**EXHIBIT 1 TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

1  A P P E A R A N C E S
2
3  FOR THE PLAINTIFF, LOWRY R. WATKINS, JR.:
4    LAURENCE J. ZIELKE, ESQUIRE
5    JANICE M. THERIOT, ESQUIRE
6    ZIELKE LAW FIRM, PLLC
7    462 South Fourth Street
8    1250 Meidinger Tower
9    LOUISVILLE, KENTUCKY  40202
10
11 FOR THE DEFENDANT, PNC BANK, National
12 Association, Individually and In Its Capacity as
13 Trustee of the TRUST UNDER WILL OF WILLIAM
14 MARSHALL BULLITT BY and THROUGH ITS TRUSTEE,
15 PNC BANK, N.A.:
16    CORNELIUS E. CORYELL, II, ESQUIRE
17    ALLISON L. BROWN, ESQUIRE
18    WYATT, TARRANT & COMBS, LLP
19    500 West Jefferson Street
20    2800 PNC Plaza
21    LOUISVILLE, KENTUCKY  40202
22
23
24
25

INDEX TO EXAMINATION

| | PAGE |
|---|---|
| EXAMINATION BY MR. CORYELL | 6 |
| EXAMINATION BY MR. ZIELKE | 313 |
| EXAMINATION BY MR. CORYELL | 324 |

INDEX TO EXHIBITS

| | PAGE |
|---|---|
| EXHIBIT 53 | 8 |
| EXHIBIT 54 | 13 |
| EXHIBIT 55 | 34 |
| EXHIBIT 56 | 39 |
| EXHIBIT 57 | 41 |
| EXHIBIT 58 | 57 |
| EXHIBIT 59 | 58 |
| EXHIBIT 60 | 63 |
| EXHIBIT 61 | 68 |
| EXHIBIT 62 | 69 |
| EXHIBIT 63 | 73 |
| EXHIBIT 64 | 75 |
| EXHIBIT 65 | 104 |

INDEX TO EXHIBITS (CONT.)

| | PAGE |
|---|---|
| EXHIBIT 66 | 114 |
| EXHIBIT 67 | 115 |
| EXHIBIT 68 | 118 |
| EXHIBIT 69 | 121 |
| EXHIBIT 70 | 124 |
| EXHIBIT 71 | 129 |
| EXHIBIT 72 | 135 |
| EXHIBIT 73 | 140 |
| EXHIBIT 74 | 148 |
| EXHIBIT 75 | 154 |
| EXHIBIT 76 | 155 |
| EXHIBIT 77 | 157 |
| EXHIBIT 78 | 162 |
| EXHIBIT 79 | 176 |
| EXHIBIT 80 | 183 |
| EXHIBIT 81 | 187 |
| EXHIBIT 82 | 192 |
| EXHIBIT 83 | 199 |
| EXHIBIT 84 | 201 |
| EXHIBIT 85 | 203 |
| EXHIBIT 86 | 206 |
| EXHIBIT 87 | 209 |

INDEX TO EXHIBITS (CONT.)

| | PAGE |
|---|---|
| EXHIBIT 88 | 213 |
| EXHIBIT 89 | 225 |
| EXHIBIT 90 | 230 |
| EXHIBIT 91 [designated confidential] | 231 |
| EXHIBIT 92 [designated confidential] | 246 |
| EXHIBIT 93 [designated confidential] | 249 |
| EXHIBIT 94 [designated confidential] | 251 |
| EXHIBIT 95 [designated confidential] | 260 |
| EXHIBIT 96 [designated confidential] | 262 |
| EXHIBIT 97 [designated confidential] | 264 |
| EXHIBIT 98 [designated confidential] | 265 |
| EXHIBIT 99 [designated confidential] | 269 |
| EXHIBIT 100 [designated confidential] | 271 |
| EXHIBIT 101 | 275 |
| EXHIBIT 102 | 280 |
| EXHIBIT 103 | 292 |

1     DEPOSITION OF LOWRY R. WATKINS, JR.
2            JUNE 14, 2016
3 LOWRY R. WATKINS, JR., called on behalf of the
4 Defendant, PNC Bank, et al., after having first
5 been duly sworn, is examined and testifies as
6 follows:
7         EXAMINATION
8 BY MR. CORYELL:
9   Q.  Mr. Watkins, we have met before. My
10 name is Corky Coryell. I represent PNC Bank
11 National Association as the trustee of the William
12 Marshall Bullitt Trust.
13     You have been deposed many times before,
14 haven't you?
15   A.  Several times.
16   Q.  Any idea how many times?
17   A.  By the case number or just total sessions?
18   Q.  Total.
19   A.  Because sometimes it was more than one
20 sitting on some of the cases.
21   Q.  How many depositions have you given?
22   A.  I would have to estimate 10, 12, just an
23 estimate.
24   Q.  So you know how a deposition works.
25

1   A.  Yes.
2   Q.  If you answer my question without first
3 telling me that you did not understand my question
4 or that you didn't hear me clearly, I am going to
5 assume that you understood my question; is that
6 fair?
7   A.  Yes.
8   Q.  If you don't understand my question and
9 you want me to repeat or rephrase it, please ask
10 me to do it and I will be happy to do that. Okay?
11   A.  Yes. All right.
12   Q.  But if you answer my question without
13 telling me that you want me to repeat it or rephrase
14 it, I am going to assume that you understood it.
15 Okay?
16   A.  Yes.
17   Q.  I always need you to give me a verbal
18 response rather than a nod of the head or a shake
19 of the head. Okay?
20   A.  All right.
21   Q.  And try to give me a verbal response
22 rather than an uh-huh or an uh-uh because it's hard
23 for her to take those down. Okay?
24   A.  Yes.
25   Q.  Always let me finish my question before

1 you start to give an answer and I will always try to
2 let you finish your answer before I ask another
3 question. Okay?
4   A.  Yes.
5   Q.  In accordance with rule 30(b)(2) of the
6 federal rules of civil procedure, we asked you to
7 produce the documents that you have produced in
8 response to our written discovery request. We
9 asked you to bring them with you here today. Have
10 you done that?
11   A.  No.
12   Q.  Why did you not do that?
13 [WHEREUPON, document is marked Exhibit 53
14 for identification.]
15     MR. ZIELKE: Because I told him not to do
16 that. You have got all the production that you
17 wanted for the five years. I think I sent an email
18 this morning about 6:24 a.m. -- I am an early
19 riser -- and I told you that it was burdensome,
20 that if you wanted to see those documents, you are
21 welcome to see them in our offices. They go back -
22 - you only wanted to see the five years, which you
23 have.
24     MR. CORYELL: Yeah.
25     MR. ZIELKE: So I don't see really any

1 problem that you needed us to haul over in almost
2 90 degree weather all of the documents we have
3 already produced.
4     MR. CORYELL: Wait a second. I've
5 marked a document -- are we on 53 or 54?
6     MS. THERIOT: We are on 53.
7     MR. CORYELL: 53? Did I just mark that
8 53?
9     MS. THERIOT: Yes.
10 BY MR. CORYELL:
11   Q.  I've handed you a document that we've
12 marked as Exhibit 53, and it's an email exchange
13 between me and Mr. Zielke. Have you see that
14 before?
15   A.  No.
16   Q.  Okay.
17     MR. CORYELL: Larry, I'll just represent
18 that this is an email exchange between you and me
19 and Janice. I don't know if Mr. Watkins has seen it
20 before, but I just want to get it in the record.
21 Contemporaneous with the service of the deposition
22 notice, I believe I sent this email asking you guys
23 to bring all the documents that Mr. Watkins
24 produced in the response to our written discovery
25 request, even the ones that we did not

1 ask you to copy, to his deposition here today.
2     MR. ZIELKE: But you don't have my
3 response.
4     MR. CORYELL: I do not have your
5 response on here, but --
6     MR. ZIELKE: I represent that my
7 response early this morning was that no, it's too
8 burdensome and you have all the documents.
9     MR. CORYELL: Okay. And burdensome
10 was that you feel it was not fair for you to have to
11 haul all of those documents over here?
12     MR. ZIELKE: Exactly. Especially when
13 we've offered to make them available to you at our
14 office and you did not want to see them.
15     MR. CORYELL: And, sure, my response
16 to that would just be that I said in my original
17 email that if you needed me to send somebody over
18 with a dolly or a cart to bring those over, just let
19 me know and I'd be happy to do that.
20     MR. ZIELKE: It's still not right because
21 they are not Bates stamped. I have not gone
22 through all those records in more than five years.
23 So you're asking for something that's just not right.
24 I couldn't let you just see documents I haven't even
25 reviewed.

1     MR. CORYELL: They were documents
2 that -- my understanding is there were two boxes of
3 documents that were in your conference room that
4 were made available for us to review, that it's my
5 understanding those were the documents that Mr.
6 Watkins had produced in response to our written
7 discovery requests.
8     All of those documents were made available to
9 us. We asked that some of those documents be
10 copied and sent to us. But it was my understanding
11 that all of those documents were being produced in
12 response to our written discovery requests and
13 were, therefore, not privileged.
14     So what I wanted was for Mr. Watkins to bring
15 all those documents with him here today in case
16 there was a document included in the material that
17 we could talk about today or that he was going to
18 reference today. And I even asked to send
19 somebody over to cart them over here. And it's my
20 understanding that those documents are not going
21 to be produced here today.
22     MR. ZIELKE: Again, you only wanted five
23 years, if those are the two boxes you are
24 referencing. They got Bates stamped. You got
25

1 copies of all those five years. We have them in the
2 office going back 15 to 20 years that you did not
3 want to look at. Those have not been Bates
4 stamped. They have not been reviewed. You've
5 already contended that -- we just had this
6 discussion with the magistrate judge -- that we can
7 only go back five years.
8     And we're briefing that right now, as you know,
9 Corky, by the end of this month. So the extent that
10 you have got those five year's worth of documents -
11 - you already have them -- to the extent it's beyond
12 the five years, I have not reviewed them. They are
13 not Bates stamped. They are in my office. You did
14 not want to look at them.
15     MS. THERIOT: And I will say there's
16 probably around 15 boxes.
17     MR. CORYELL: Okay. Well, if I
18 understand correctly, you are not going to produce
19 any documents here today.
20     MR. ZIELKE: You are more than welcome
21 to come to my office and review any documents you
22 want.
23     MR. CORYELL: But you are not going to
24 produce any documents here today.
25     MR. ZIELKE: No, I am not going to bring

1 them here.
2     MR. CORYELL: Okay. And you're not
3 going to allow me to send somebody over to pick
4 them up and bring them over here.
5     MR. ZIELKE: No, I'm not. They are not
6 reviewed. They are not Bates stamped.
7     MR. CORYELL: Okay.
8 [WHEREUPON, document is marked Exhibit 54
9 for identification.]
10 BY MR. CORYELL:
11     Q.   The next document -- Mr. Watkins, I am
12 handing you a document that's been marked Exhibit
13 54. I'll represent to you that this is a copy of the
14 amended complaint that you filed in this action or
15 that was filed on your behalf in this action.
16     A.   Yes, I see it.
17     Q.   You have seen this document before;
18 right?
19     A.   Yes.
20     Q.   Paragraph 17 -- I am calling your
21 attention to Paragraph 17 which is on Page 4 --
22 references a request for proposals that was
23 generated and sent out by PNC Bank. Do you see
24 that reference?
25

4 (Pages 10 - 13)

1  A.  Yes.  It's Number 17.
2  Q.  Yes.  And Paragraph 17 also indicates
3  that a copy of the RFP is attached to the amended
4  complaint.  Do you see that reference?
5  A.  Yes, a copy of which is attached.
6  Q.  And there is a copy of the RFP that's
7  attached to this amended complaint; correct?
8  A.  It's a request for proposals.  It starts six
9  pages from the back.
10  Q.  Where did that RFP come from?
11      MR. ZIELKE:  Lowry, my advice to you,
12  Mr. Watkins, is that you --
13      MR. CORYELL:  Larry, you are not --
14      MR. ZIELKE:  Counsel, we are claiming
15  attorney/client privilege.
16      MR. CORYELL:  Larry, this is -- that's not
17  proper.  That's a speaking objection.  If you want
18  to make an objection, of course you are entitled to
19  make an objection, but you're not entitled to make
20  a speaking objection.
21      MR. ZIELKE:  I am entitled to advise this
22  witness of his rights as an attorney/client
23  privilege, and that's what I just did.
24      MR. CORYELL:  Absolutely.  But you're
25  not entitled to coach the witness or make a

1  speaking objection during the course of the
2  deposition.
3  BY MR. CORYELL:
4  Q.  Mr. Watkins, where did this RFP come
5  from?
6      MR. ZIELKE:  Again, same admonition.
7  A.  Do you mean who created it?
8  BY MR. CORYELL:
9  Q.  No, who supplied the RFP?  I know who
10  created it.  My question is, where did you get a
11  copy of the RFP to attach to your amended
12  complaint?
13      MR. ZIELKE:  Objection.
14  A.  I am really not sure, but maybe --
15      MR. ZIELKE:  Don't guess.
16      THE WITNESS:  All right.
17  BY MR. CORYELL:
18  Q.  Was a copy of the RFP sent to you?
19  A.  I don't recall.
20  Q.  Did PNC send a copy of the RFP to you?
21  A.  It would just be a guess.
22      MR. ZIELKE:  Don't guess.
23  BY MR. CORYELL:
24  Q.  PNC did not send a copy of the RFP to
25  you, did they?

1  A.  I don't know.
2  Q.  Do you recall PNC sending a copy of the
3  RFP to you?
4  A.  Not really.
5  Q.  So this RFP was not a document that was
6  sent to you; correct?
7  A.  I don't know.
8  Q.  Was this RFP sent to you, Mr. Watkins?
9      MR. ZIELKE:  Corky, he said, I don't
10  know.
11  BY MR. CORYELL:
12  Q.  You don't know if you received a copy of
13  this RFP from PNC?
14  A.  I don't recall.
15  Q.  Was the RFP that was attached to your
16  amended complaint given to your attorney by you?
17  Did you give this RFP to your attorney to attach to
18  the amended complaint?
19  A.  There were many banker boxes I took to
20  my attorney.  It may have been in one of those.
21  Q.  Okay.  Where did you get the RFP before
22  you gave it to your attorney?
23  A.  I just don't recall.  I have got a lot of
24  documents from PNC or sometimes Jim Couch.
25  Q.  Mr. Couch gives you a lot of infor --

1      MR. ZIELKE:  Excuse me.  You have to let
2  him answer.
3  BY MR. CORYELL:
4  Q.  Mr. Couch gives you a lot of information?
5  A.  Some.
6  Q.  He gives you a lot of documents?
7  A.  Over the years.
8  Q.  It's your testimony that Mr. Couch gave
9  you this RFP?
10  A.  I am not sure.
11  Q.  So, as we sit here today, Mr. Watkins, are
12  you telling me that you don't know where the RFP
13  that was attached to your amended complaint came
14  from?
15  A.  That is correct.
16  Q.  Under oath, you're telling me that you
17  don't know the source of the RFP that was attached
18  to your amended complaint?
19      MR. ZIELKE:  I object.  Asked and
20  answered.  And of course he's under oath.
21  A.  I am not clear on how --
22  BY MR. CORYELL:
23  Q.  I am not asking if you are clear.  I am
24  asking you if you know, if you have any information
25  about where the RFP that is attached to the

5 (Pages 14 - 17)

1 complaints do you have about the RFP process, Mr.
2 Watkins?
3    A. Well, I'll direct you to 20, what counsel
4 wrote: The RFP allows the trustee to breach its
5 duty of loyalty as set out in KRS 386B.8-020.
6    Q. What does that mean?
7    A. Well, it starts at the top and allows the
8 trustee to maximize its own fees.
9    Q. Tell me specifically what the trustee has
10 done in the RFP process to maximize its own fees.
11    A. If it takes effect. But that's potential.
12    Q. Tell me specifically what the trustee has
13 done to maximize its own fees improperly in the
14 RFP process.
15    A. Specifically, I can't right now.
16    Q. As we sit here today, you can't tell me any
17 specific thing that the trustee has done or not done
18 in the RFP process to maximize its own fees
19 improperly; correct?
20    A. Not in detail, no.
21    Q. Okay. Now, in Paragraph 19, you
22 reference David Nicklies. And you were about to
23 say something about that and you stopped, didn't
24 you?
25    A. Yeah, because it's talking about him, not

1 the trustee.
2    Q. Well, in Paragraph 19 you had alleged
3 that Mr. Nicklies resigned his position as a
4 consultant so that he could submit a proposal
5 under the RFP, thereby creating a conflict of
6 interest. You alleged that, didn't you?
7    A. I'll go with what the document says.
8    Q. You have seen the responses to the RFP,
9 haven't you? They have been produced to you in
10 this litigation, haven't they?
11    A. Whose responses?
12    Q. All the responses to the RFP. Have you
13 seen them?
14    A. Uh, from who?
15    Q. All of the responses to the RFP have been
16 produced to you in this litigation many months ago.
17 Have you seen them?
18    A. Perhaps.
19    Q. Are you aware that Mr. Nicklies didn't
20 respond to the RFP?
21    A. I think so.
22    Q. So the complaint that you had in
23 Paragraph 19 didn't materialize, did it?
24    A. I guess not.
25    Q. And in Paragraph 22 and 23, you indicate

1 that the Court should suspend the trustee and
2 appoint a special master, don't you?
3    A. Appoint a special fiduciary.
4    Q. But you never asked the Court to do that,
5 have you?
6    A. Uh, I am not sure. It's counsel's --
7    Q. To your knowledge, has your counsel
8 asked the Court to appoint a special fiduciary?
9    A. It's saying it here.
10    Q. To your knowledge, has the Court followed
11 through on that and asked the Court to appoint a
12 special fiduciary to oversee the RFP process?
13    A. I don't think the Court has done that yet.
14    Q. What's your understanding of where the
15 RFP process stands in its progress?
16    A. I don't know.
17    Q. Do you understand that the RFP process
18 has progressed in the last couple of years since
19 you filed this complaint?
20    A. How do you mean, progressed?
21    Q. Did they receive responses, that the
22 responses been evaluated, that proposals have
23 been made? I mean, there have been a lot of
24 documents produced to you in this litigation
25

1 regarding the RFP process. Haven't you seen any
2 of these documents?
3    A. I went through some big binders
4 yesterday.
5    Q. Okay.
6    A. There were some emails in there and some
7 correspondence.
8    Q. Okay. About the RFP process?
9    A. Development on Oxmoor.
10    Q. With respect to the RFP that is attached
11 to your amended complaint that you've specifically
12 complained about in this lawsuit, what is your
13 understanding of that process and where it stands?
14    A. It's --
15    Q. Do you not have any understanding of
16 where it stands?
17    A. There was -- those binders had
18 correspondence and emails in them from '14, '15 --
19 2014 and 2015. It was back and forth between
20 people and among people. Some appraisals were in
21 those binders and copies and things like that.
22    Q. That's not what I am asking. I am not
23 asking what's in the binders. I am asking you what
24 is your understanding of what the status is of the
25

1  about in your amended complaint.
2    A.  The current status on it?
3    Q.  Yes, sir.
4    A.  No.
5    Q.  No what?  You don't have any
6  understanding of the current status; is that
7  correct?
8    A.  Yeah, that's correct.
9    Q.  Okay.  Is it true you recently visited
10  Oxmoor Farm?
11    A.  Yes.
12    Q.  You visited Oxmoor Farm in the last two or
13  three weeks?
14    A.  Yes.
15    Q.  Who was with you?
16    MS. THERIOT:  If your counsel was with
17  you, then it's attorney/client privilege, what was
18  said.
19    MR. CORYELL:  The fact that his counsel
20  was with him is not attorney/client privilege.
21  BY MR. CORYELL:
22    Q.  Who was with you?
23    MR. CORYELL:  I haven't asked him what
24  was said.
25    Q.  Who was with you?

1    A.  I am referring to counsel.
2    Q.  Mr. Zielke was with you?
3    A.  Yes.
4    Q.  Anybody other than Mr. Zielke?  It's my
5  understanding there was at least one other person
6  with you.  Who was that other person?
7    MS. THERIOT:  I am going to instruct him
8  not to answer right now.  It was trial prep.  It was
9  something to do with this case.
10    MR. CORYELL:  No, I don't think that's a
11  fair objection.
12  BY MR. CORYELL:
13    Q.  Who was with you?
14    MS. THERIOT:  We can take it up with the
15  Court.
16  BY MR. CORYELL:
17    Q.  Was somebody with you other than Mr.
18  Zielke?
19    A.  Yes.
20    Q.  How many other people were with you
21  other than Mr. Zielke?
22    MS. THERIOT:  We are not going to
23  identify the people who were with him.
24    MR. CORYELL:  I didn't ask him to
25  identify.  I asked him, how many people other than

1  Mr. Zielke were with you?
2    A.  One.
3  BY MR. CORYELL:
4    Q.  Was it a man or a woman?
5    MS. THERIOT:  You can answer that.
6    A.  A man.
7  BY MR. CORYELL:
8    Q.  Was that person an attorney?
9    MS. THERIOT:  I am going to instruct him
10  not to answer.
11  BY MR. CORYELL:
12    Q.  Are you going to decline to answer that
13  question based on your counsel's advice?
14    A.  Yes, on advice of counsel, I decline to
15  answer.
16    Q.  For what purpose did you visit the farm
17  with Mr. Zielke and another person that you are
18  refusing to identify?
19    A.  I will repeat my response as answered
20  previously.  On the advice of counsel, I decline to
21  answer.
22    Q.  You are not going to tell me why you
23  visited the farm?
24    A.  No.
25    MR. CORYELL:  Are you telling him not to

1  answer that question?
2    MS. THERIOT:  I told him not to answer.
3  I told you it had to do with this case.
4    MR. CORYELL:  You know, Janice, that's
5  not a legitimate objection.  It's not a fair objection.
6  Of course it had to do with this case and that's why
7  I am asking him about it.
8    MS. THERIOT:  It's the first time counsel
9  has gone to view the property.
10    MR. CORYELL:  There was somebody
11  other than his counsel with him.  I don't know how
12  the identity of that person could be privileged or
13  work product.  But, you know, if you are instructing
14  him not to answer --
15    MS. THERIOT:  I am instructing him not to
16  answer.
17  BY MR. CORYELL:
18    Q.  Where did you go when you went to the
19  farm?
20    A.  On the advice of counsel, I don't want to
21  go any further into the subject matter that you
22  are --
23    Q.  You are not going to answer my question?
24    A.  No.
25    MR. CORYELL:  Are you instructing him

8 (Pages 26 - 29)

1   A.   All right.  I think only this Paragraph 12 is
2   talking about, not provided relative information.
3   And there was a response to my letter.
4   Q.   You are talking about the September 13,
5   2013 letter; correct?
6   A.   Yes.
7   Q.   So the only specific request for
8   information that you identify in your complaint that
9   was denied by the trustee was the September 13,
10  2013 letter; correct?
11  A.   Correct.
12  Q.   And your amended complaint does not
13  identify any other specific requests for information
14  that was denied by the trustee, does it?
15  A.   This one.
16  Q.   Your amended complaint is Exhibit 54.
17  A.   I don't see any complaint about requesting
18  information and not receiving it in the amended
19  complaint.
20  Q.   So the only specific request for
21  information that you were denied by the trustee
22  that you've identified in your complaint or your
23  amended complaint or your letter is the September 13, 2013
24  letter; correct?
25  A.   Correct.

1   [WHEREUPON, document is marked Exhibit 56
2   for identification.]
3   BY MR. CORYELL:
4   Q.   Now, I represent to you that even though
5   your complaint indicates that a copy of that letter
6   was attached to the complaint, the copy of the
7   complaint that was served on PNC and a copy of
8   the complaint that was filed in the Jefferson Circuit
9   Court file, they did not have a copy of that letter.
10  So I am handing you a document that we have
11  marked as Exhibit 56.
12  A.   My letter you are talking about.
13  Q.   Well, the letter that you are referring to in
14  Paragraph 12 of your complaint which was
15  identified as September 13, 2013. So I am asking
16  you, is Exhibit 56 the document that you are
17  referring to in Paragraph 12 of your complaint?
18  A.   Yes, the dates agree.
19  Q.   So this is the letter that you are referring
20  to in your complaint; correct?
21  A.   Yes.
22  Q.   This letter is not directed to PNC, is it?
23  A.   No.
24  Q.   To whom is it directed?
25  A.   James Couch.  His company is Beargrass

1   Realty.
2   Q.   Do you consider Beargrass Realty and
3   PNC to be one and the same?
4   A.   Beargrass Realty had a contract with PNC
5   Bank to manage real estate and trusts.
6   Q.   Is that a yes?
7   A.   Yes.
8   Q.   So you consider Beargrass Realty and
9   PNC to be one and the same.  You consider
10  Beargrass Realty to be PNC's agent.
11  A.   The contract employment agreement they
12  have, the contract --
13  Q.   I understand.  So is it fair to say that any
14  request for information that you make to Mr. Couch,
15  you consider that to be a request for information
16  made to the trustee?
17  A.   I suppose so, as agent for the trustee.
18  Q.   It's your understanding that Mr. Couch is
19  the agent for the trustee for purposes of managing
20  Oxmoor Farm and taking care of the various -- he
21  has various responsibilities regarding Oxmoor Farm
22  and the developed properties out there; correct?
23  A.   Yes.
24  Q.   So is it likewise fair to say that you
25

1   believe any information that you get from Mr.
2   Couch, you consider that to be coming from PNC?
3   A.   Yes.
4   Q.   Okay.  So in your mind, when you ask Mr.
5   Couch for information, you are asking the trustee;
6   correct?
7   A.   Yes, the person that is closest involved
8   with the real estate. He is the real estate man.  He
9   has been for the Marshall Bullitt Trust at Oxmoor.
10  Q.   So it's fair to say that in your mind when
11  you get information from Mr. Couch, you consider
12  that information to be coming from the trustee?
13  A.   Yes, they are joined at the hip, so to
14  speak.
15  Q.   Okay.  Now, when you say in your
16  complaint in Paragraph 12 about this September
17  13, 2013 letter, you say, such information was
18  refused.  Are you saying you didn't get any
19  response at all?
20  A.   I did receive a letter from a trust officer,
21  a trust person at PNC Bank.
22  Q.   So you did get a response?
23  A.   It was -- I considered it a response, but --
24  [WHEREUPON, document is marked Exhibit 57
25

1 for identification.]
2 BY MR. CORYELL:
3   Q.   I am handing you a document that we've
4 marked as Exhibit 57.  Do you recognize this
5 document?
6   A.   Yes.
7   Q.   Who is Cynthia Maddox?
8   A.   At that time, senior vice president and
9 trust director of PNC Bank.
10  Q.   She worked for PNC; correct?
11  A.   Yes.
12  Q.   And she responded to your September 13,
13 2013 letter to Mr. Couch, didn't she?
14  A.   Yes, she's referring to it in the first
15 paragraph.
16  Q.   And she sent a response to your
17 September 13, 2013 letter within two weeks of
18 when you sent that letter, didn't she?
19  A.   Yes.
20  Q.   So you did get a response from the
21 trustee; correct?
22  A.   Yes.
23  Q.   Ms. Maddox says in her letter, her
24 response to you, that -- this is in the second
25 paragraph.  She says, In your role as beneficiary

1 of the William Marshall Bullitt Trust, you have
2 made numerous inquiries regarding development
3 activities and have been provided with extensive
4 information on that topic.  Is that true?
5   A.   I might disagree with extensive
6 information.
7   Q.   Let's break that sentence down.  Is it true
8 that you had made numerous inquiries regarding
9 development activities?
10  A.   Yes, over the years on Oxmoor.
11  Q.   Is it true that you have been provided with
12 extensive information on the topic of development
13 activities?
14  A.   A fair amount of information of -- it's --
15 define extensive.
16  Q.   Would you agree that you had been
17 provided with -- you had, prior to September of
18 2013, been provided with a lot of information about
19 development activities?
20  A.   Yes, because I requested it.
21  Q.   Yeah.  So you have requested information
22 in the past.
23  A.   Yes.
24  Q.   On many occasions; correct?
25  A.   Yes.

1   Q.   And you have been provided with
2 information in the past on many occasions, haven't
3 you?
4   A.   Yes.
5   Q.   Had any of the information that you had
6 been provided with prior to September 2013, to
7 your knowledge, been inaccurate?
8   A.   There may be inaccuracies in it.  I haven't
9 cross-checked, double-checked everything.
10  Q.   As we sit here today, Mr. Watkins, can you
11 identify any inaccuracies that were in any
12 information, that was in any information that was
13 provided to you regarding development activities
14 prior to September of 2013?
15  A.   I think in some of the leases it would be.
16 The survey on a site wouldn't be exactly the same
17 as what was mentioned in a lease.
18  Q.   Are we talking about development
19 activity?
20      MS. THERIOT:  Let him finish.  Let him
21 finish.
22  A.   As to the size of a lot.  The acreage would
23 be sometimes a little different.
24 BY MR. CORYELL:
25  Q.   So you think there might be discrepancies

1 in the property descriptions about some of the
2 lease property; correct?
3   A.   Yes, some of the lots.
4   Q.   How would that affect you?
5   A.   It's just some mismatches that I noticed.
6   Q.   But how would that affect you as an
7 income beneficiary?
8   A.   It could.  I don't like two pieces of paper
9 side by side and they don't -- there's a
10 disagreement between the two pieces.
11  Q.   Can you identify any specific instance that
12 you are talking about?
13  A.   I think on a few of the ground leases
14 there's a difference between what the lease says
15 and the survey.
16  Q.   What specific ground leases are you
17 talking about?
18  A.   Maybe some in Oxmoor Court.
19  Q.   I don't want you to speculate.  Can you
20 identify any specific ground leases as we sit here
21 today?
22      MS. THERIOT:  He might have if you
23 would have just let him finish his sentence.
24  A.   I would have to look at my files.  But as I
25 recall in the past, I used to just see some numbers

12 (Pages 42 - 45)

1 that didn't match the size of the demised premises,
2 the lot.
3 BY MR. CORYELL:
4    Q.   Anything other than that that you believe
5 was inaccurate information that was provided to
6 you prior to 2013 regarding development activities?
7    A.   Right now I can't recall.
8    Q.   So prior to, so in September of 2013, you
9 made an inquiry with Jim Couch that was reflected
10 in your letter regarding development activities on
11 the Oxmoor Farm; correct?
12    A.   Yes.
13    Q.   And you had made an inquiry like that on
14 many occasions in the past; correct?
15    A.   On several cases.
16    Q.   And you have been provided with
17 information regarding development activities on
18 many occasions in the past prior to September of
19 2013; correct?
20    A.   Several.
21    Q.   And as we sit here today, you cannot
22 identify any inaccuracies in the information that
23 had been provided to you regarding development
24 activities other than some possible discrepancies
25

1 with respect to some of the leases in the Oxmoor
2 Center; correct?
3    A.   Not Oxmoor Center, Oxmoor Properties,
4 Oxmoor Court, which I call that the commercial
5 subdivision.  It has restaurants and car dealerships
6 in there.
7    Q.   Other than the discrepancy in those
8 leases, you can't identify any inaccuracies that
9 PNC ever made to you with respect to development
10 activities; correct?
11    A.   I can't think of anything right now at this
12 time.
13    Q.   Now, Ms. Maddox also indicates that you
14 have participated in meetings in which development
15 activities have been extensively discussed.  Is that
16 true?
17    A.   Yes.
18    Q.   How many meetings do you think you have
19 participated in over the years in which development
20 activities have been discussed?
21    A.   Ten, 20.
22    Q.   Dozens?
23    A.   Less than two dozen.
24    Q.   But as many as 20?
25    A.   Yes, it could be ten to 20.

1    Q.   So you participated in at least ten, maybe
2 as many as 20 meetings over the years in which
3 development has been discussed; correct?
4    A.   Yes.
5        MS. THERIOT:  Let him finish his question
6 -- answers.
7 BY MR. CORYELL:
8    Q.   Meetings with PNC?
9    A.   Sometimes.
10    Q.   Who else would be involved in those
11 meetings?
12    A.   The co-trustees.
13    Q.   Stock Yards Bank?
14    A.   I think they have had represented some.
15    Q.   Who else?
16    A.   Well, the original co-trustees:  Citizens
17 Fidelity Bank and Thomas Bullitt.
18        MS. THERIOT:  He's trying to answer your
19 question.
20    A.   Then PNC Bank and Thomas Bullitt when
21 they were co-trustees and then, since 1991, PNC
22 Bank.  And like you said, Stock Yards Bank
23 because there is a trust over there and they have
24 an interest in the property because of the Thomas
25 Bullitt Trust at Stock Yards Bank.

1 BY MR. CORYELL:
2    Q.   So over the years, you have participated
3 in perhaps as many as 20 meetings where
4 development was discussed; correct?
5    A.   Yes, dating back to the 1960s.
6    Q.   And in any of those meetings, can you
7 identify any information that was provided in any of
8 those meetings that you now believe was
9 inaccurate?
10    A.   I would say the scope, the outcome
11 from -- as a result of those meetings wasn't what I
12 expected.
13    Q.   Now, can you identify any information, any
14 representations that were made to you or any of the
15 other beneficiaries during any of the 20 meetings
16 that you have identified that you've stated that you
17 participated in concerning development that you
18 believe were inaccurate?
19        That's a long pause, Mr. Watkins.  So you need
20 time to think about that; right?
21    A.   Yes, I do.
22    Q.   Can you identify any statements, as we sit
23 here today, any statements that had been made
24 during any of the 20 or more meetings that you
25 participated in concerning development that you

1 believe were inaccurate or were misrepresentations
2 by the trustee?
3    A.  I can't think of any at this time.
4    Q.  How many of those meetings -- how many
5 meetings concerning development have you
6 participated in since 2008?  That is, in other
7 words, in the last eight years, in the five years
8 before this lawsuit was filed?
9    A.  Perhaps five or six.
10    Q.  Okay.  And is it true that you, in addition
11 to participating in those meetings, have been
12 provided with numerous documents that talk about
13 development activities?
14    A.  Some documents.
15    Q.  Okay.  So you participated in numerous
16 meetings concerning development activities;
17 correct?
18    A.  Yes.
19    Q.  You've received numerous documents
20 concerning development activities; correct?
21    A.  Some documents.
22    Q.  And as we sit here today, you cannot
23 identify any inaccuracies or misrepresentations
24 that were made by the trustee concerning
25 development activities in any of those meetings or

1 in any of those documents; correct?
2    A.  I was led to believe there would be more
3 development than has occurred in those meetings,
4 which led to disappointment on behalf of this
5 income beneficiary.
6    Q.  Isn't it true that you are the only income
7 beneficiary who has filed a lawsuit against PNC?
8    A.  As far as I know.
9    Q.  You have had a lot of complaints with
10 PNC, haven't you, over the years?
11    A.  Several.
12    Q.  And your co-income beneficiaries
13 frequently do not agree with your complaints; is
14 that fair?
15    A.  That's fair.
16    Q.  And Ms. -- now let me go back to my
17 question.  As we sit here, you have attended
18 numerous meetings concerning development; right?
19    A.  Yes.
20    Q.  You have been provided with lots of
21 documents concerning development activities;
22 correct?
23    A.  Yes.
24    Q.  And as we sit here today, you cannot
25 identify any specific misrepresentations or

1 misstatements that were made by PNC in any
2 meeting or in any document concerning
3 development activities.
4        MS. THERIOT:  Objection.  He did identify
5 some.  He answered that question.
6        MR. CORYELL:  Can I finish my question,
7 please?
8 BY MR. CORYELL:
9    Q.  Let me start over.  You told me that you
10 were generally disappointed, that you thought there
11 was going to be more development than there was.
12    A.  That was what I was led to believe at
13 some of the meetings.
14    Q.  Just so we know --
15        MS. THERIOT:  Let him finish his answer.
16 BY MR. CORYELL:
17    Q.  Just so we know, just so that you know,
18 I'm asking you to tell me, specifically to tell me
19 what specific misrepresentations you believe were
20 made by PNC with regard to development activities.
21    So let me ask my question again.  You have
22 attended numerous meetings concerning
23 development activities; correct?
24
25

1    A.  Yes.
2    Q.  You have seen numerous documents
3 concerning development activities; correct?
4    A.  Yes.
5    Q.  And as we sit here today, you can't
6 identify any specific misrepresentations that you
7 believe the trustee, PNC, made regarding
8 development activities; correct?
9    A.  They lead me to believe there's going to
10 be development such as in 2001 or 2002 and some
11 other times, which I call false starts.  They led all
12 the income beneficiaries believing that things were
13 going to be happening, more new development, and
14 it didn't occur.
15    Q.  Has anything like that happened since
16 2008?
17    A.  A great deal of money has been expended
18 for fees and expenses.  And where's the
19 development?
20    Q.  Since 2008, you have attended numerous
21 meetings concerning development activities,
22 haven't you?
23    A.  Not so many since 2008.
24    Q.  You have attended a number of meetings
25 concerning development activities since 2008,

14 (Pages 50 - 53)

1 haven't you?
2 A. A few, yes.
3 Q. And since 2008, you have been provided
4 with a number of documents concerning
5 development activities, haven't you?
6 A. Yes.
7 Q. But as we sit here today, you cannot
8 identify any misrepresentations that PNC has made
9 concerning development activities since 2008, can
10 you?
11 MS. THERIOT: Objection. Asked and
12 answered.
13 A. To lead me and others into thinking that
14 there's going to be development and there isn't
15 any, that's -- to me that's a misrepresentation.
16 BY MR. CORYELL:
17 Q. So you think that PNC has intentionally
18 told you that there was going to be development
19 knowing that it wasn't going to be developed?
20 A. I didn't know there wasn't going to be
21 development.
22 Q. No, you are saying PNC knew that it
23 wasn't going to be. Are you telling me that they
24 told you that there was going to be development --
25 A. I don't know whether they knew it or not.

1 Q. Let me finish my question, sir.
2 A. All right. Sorry.
3 Q. Are you telling me that PNC told you,
4 represented to you that there was going to be
5 development when it knew that there wasn't going
6 to be development?
7 A. No, I am not telling you that.
8 Q. Then let me ask my question. I mean,
9 that's the question I asked. Listen to my question,
10 please.
11 A. Okay.
12 Q. You have seen a lot of documents since
13 2008, right, concerning development; right?
14 A. Yes.
15 Q. You've attended meetings concerning
16 development since 2008; correct?
17 A. Yes.
18 Q. As we sit here today, can you identify any
19 statement that PNC has made to you or any other
20 beneficiary concerning development knowing that
21 that statement was not true?
22 A. No, I cannot.
23 Q. Okay. Thank you. Now, in Ms. Maddox's
24 response to your September 13, 2013 letter, she
25 says in the very last paragraph, If you have

1 specific questions relating to the development
2 activities on the property, we will attempt to
3 address them. Did you understand that she was
4 inviting you to contact her if you had any specific
5 requests?
6 A. Yes.
7 Q. Did you do that?
8 A. No.
9 Q. Because when you sent this letter to her,
10 you knew you were going to file a lawsuit, didn't
11 you?
12 A. I --
13 Q. When you sent your letter to Mr. Couch,
14 you knew you were going to file a lawsuit; right?
15 A. Probably.
16 Q. And so you were sending this letter to Mr.
17 Couch to try to get information for your lawsuit,
18 weren't you?
19 A. I just wanted an answer from him to give
20 me a -- reasons for the pace of development.
21 Q. When you sent that letter to Mr. Couch,
22 you had already retained Mr. Zielke to file this
23 lawsuit on your behalf, hadn't you?
24 A. I think so.
25 Q. Yeah, so you were just trying to get some

1 information to give Mr. Zielke to put in your
2 lawsuit; right?
3 A. Yes.
4 [WHEREUPON, document is marked Exhibit 58
5 for identification.]
6 BY MR. CORYELL:
7 Q. Okay. Let me show you a document we've
8 marked as Exhibit 58. That's a letter from Mr.
9 Zielke to me dated October 8, 2013. Have you
10 seen that letter before?
11 A. Yes.
12 Q. That was sent less than a month after you
13 sent your letter to Mr. Couch; correct?
14 A. Yes.
15 Q. Were you aware that Mr. Zielke had
16 contacted Mary Helen Myles at PNC around the
17 time that you sent your letter to Mr. Couch?
18 A. I think I was aware of that.
19 Q. Did you give Mr. Zielke Mr. Helen Myles
20 name?
21 A. Probably.
22 Q. And for what purpose did you give him her
23 name?
24 A. I think she was the current trust officer on
25 the account.

1 Q. So you gave Mr. Zielke Mary Helen's name
2 so that he could reach out to her and to try to get
3 some information to put in your lawsuit?
4 A. I suppose.
5 Q. Okay. How long before -- so it's in
6 September of 2013 you were planning on filing a
7 lawsuit and you had retained Mr. Zielke and you
8 were trying to get some information from the trust
9 even though you didn't say you were going to file a
10 lawsuit, did you?
11 A. No.
12 Q. Do you think that's a little bit misleading,
13 Mr. Watkins, to ask them for information that you
14 intend to use in a lawsuit without telling them what
15 you are doing?
16 A. Uh, no.
17 Q. You think that's okay?
18 A. Yes.
19 Q. Okay. How long before you sent your
20 letter to Mr. Couch in September of 2013 had you
21 been thinking about filing a lawsuit?
22 A. I have been annoyed with the pace of
23 development for several years.
24 [WHEREUPON, document is marked Exhibit 59
25 for identification.]

1 BY MR. CORYELL:
2 Q. I hand you a document that we have
3 marked as Exhibit 59. You didn't feel like asking
4 for information without telling them that you were
5 thinking about filing a lawsuit was a little like
6 ambushing them?
7 A. I don't think PNC Bank has run my
8 grandfather's trust properly.
9 Q. No, that's not the question I asked. You
10 didn't feel like you were ambushing them by asking
11 for information to put in your lawsuit without telling
12 them that you were going to file a lawsuit?
13 A. No.
14 Q. Have you seen Exhibit 59 before?
15 A. Yes.
16 Q. Were you aware that I had -- this is a
17 letter from me to Mr. Zielke; right?
18 A. Yes.
19 Q. And it's responding to Exhibit 58, which is
20 his letter from October 8, 2013; correct?
21 A. Yes.
22 Q. Were you aware that I had told Mr. Zielke
23 to direct any further questions that you might have
24 directly to me?
25 A. Yes.

1 Q. Because, by then, Mr. Zielke had made it
2 clear that you intended to sue PNC, hadn't he?
3 A. Yes.
4 Q. So just to review the bidding on this last
5 line of questioning, in September of 2013 you sent
6 a letter to PNC; correct?
7 A. Yes.
8 Q. PNC responds to that letter within a week
9 or so; correct?
10 A. I sent the letter to PNC Bank's agent, Jim
11 Couch, Beargrass Realty.
12 Q. I'm not disputing that. I understand why
13 you think Mr. -- and I agree. So, in your mind, you
14 sent a letter on September 13, 2013. You sent a
15 letter to PNC; correct? And I am not disputing
16 that. That's fine. I agree that Mr. Couch -- I
17 understand that he was PNC in your mind, and I
18 think that's fair.
19 A. In charge of real estate, and this is a real
20 estate request.
21 Q. So let me just go back and start over. On
22 September 13, 2013, you sent a letter asking about
23 development to PNC; right?
24 A. We have got to be correct here.
25 Q. Go ahead.

1 A. PNC's agent for managing trust real
2 estate.
3 Q. And PNC responded to that letter within
4 ten days; correct?
5 A. Yes, September 23rd. It's on PNC
6 stationary.
7 Q. And they told you that if you have any
8 specific questions about the pace of development,
9 you should feel free to call them; correct?
10 A. Yes.
11 Q. But you never did that; correct?
12 A. No, I thought it -- I just thought it would
13 be a waste of time.
14 Q. Instead of following up and taking them up
15 on their offer to give you more information, you got
16 Mr. Zielke to send his letter; correct?
17 A. Yes.
18 Q. And then you filed a complaint claiming
19 that PNC never responded to your September 13th
20 letter; correct?
21 A. This is not an answer and this is not a
22 response.
23 Q. And that's what you said in your
24 complaint; correct?
25 MS. THERIOT: The complaint speaks for

16 (Pages 58 - 61)

1  Davis wrote a book about my grandfather.
2  Q.  Was there an event to roll that book out?
3  A.  Maybe.
4  Q.  So you don't really know what that re line
5  is about, William Marshall Bullitt Biography Event?
6  A.  The only biography I know of is the
7  William Marshall Bullitt.
8  Q.  In any event, you asked Ms. Georgehead
9  on November of -- in November of 2011, you ask
10  her -- you said, I need to know reasons why
11  Oxmoor has been developed at the pace it has been
12  from 1957 to 2011; correct?
13  A.  Yes.
14  Q.  You sent her this email; right?
15  A.  Yes.
16  Q.  It looks like you sent it at 10:42 in the
17  morning; right?
18  A.  Yes.
19  Q.  And then she responded less than a week
20  later; correct?
21  A.  Six days later.
22  Q.  And she provided you with a description of
23  the development history of Oxmoor; correct?
24  A.  Some.
25  Q.  She provided you with the description of

1  the development history of Oxmoor since 2001,
2  didn't she?
3  A.  Since 2001?  Oh, she mentions efforts
4  more than ten years ago:  I'll talk to Jim Couch and
5  I will report back to you.
6  Q.  Okay.
7  A.  I don't think she ever reported back to me.
8  Q.  She provided you with a description of the
9  development history of Oxmoor since 2001;
10  correct?
11  A.  How complete that is, I don't know.
12  Q.  And everything that she said in this email,
13  to your knowledge, is accurate, isn't it?
14  A.  I wouldn't know that.
15  Q.  There's nothing in this email that you can
16  identify as inaccurate, is there?
17  A.  No.
18  Q.  And even before 2011, even before this
19  email from Ms. Georgehead, you have been
20  provided with information concerning development
21  and development activities, haven't you?
22  A.  Yes.
23  [WHEREUPON, a brief recess was taken.]
24  [WHEREUPON, Ms. Theriot left the deposition.]
25

1  BY MR. CORYELL:
2      MR. CORYELL:  Just for the record,
3  Larry, we swapped out Exhibit 60.  The one that we
4  had previously was the unBates stamped version of
5  that.  And that's the November 15th, 2011 email
6  from Mr. Watkins to Ms. Georgehead with her
7  response November 21st, 2011.  The version we
8  were talking about previously did not have a Bates
9  stamp number on it, so we swapped out the version
10  Bates stamped PNC 009235.
11      MR. ZIELKE:  I have got it.  Thank you.
12  [WHEREUPON, document is marked Exhibit 61
13  for identification.]
14  BY MR. CORYELL:
15  Q.  Okay.  I am handing you a document that
16  we marked as Exhibit 61.  This is an email from Ms.
17  Georgehead dated October 7, 2011; correct?
18  A.  Yes.
19      MR. ZIELKE:  You have time to read it.
20  A.  Yeah, let me read it.  Okay.
21  BY MR. CORYELL:
22  Q.  This is an email to you and the other
23  beneficiaries dated October 7, 2011; correct?
24  A.  Yes.
25  Q.  The subject of the email is Oxmoor

1  Update; correct?
2  A.  Yes.
3  Q.  And this email reflects information and
4  thoughts that the trustee has on development of the
5  Oxmoor property, doesn't it?
6  A.  Yes.
7  [WHEREUPON, document is marked Exhibit 62
8  for identification.]
9  BY MR. CORYELL:
10  Q.  I am handing you a document that we have
11  marked as Exhibit 62.  This was a document that
12  was produced by you in this litigation.  You can tell
13  that by the Bates stamp at the bottom.
14  A.  Yes.
15  Q.  Have you seen this document before?  I
16  assume that you have since it's your document.
17  A.  Yes.
18  Q.  Do you know what this document is?
19  Strike that.  Let me ask another question.  Are you
20  aware that this document is a petition that was
21  filed by PNC back in 2010 to seek the Court's
22  approval of a sharing agreement with the trustee of
23  the Thomas W. Bullitt Trust?
24  A.  Yes.
25  Q.  You are familiar with that process?

18 (Pages 66 - 69)

1 A. Yes.

2 Q. You have those reports for 1974; correct?

3 A. I think this is the earliest, furthest they

4 go back.

5 Q. Okay. So and those reports provide

6 information about the trust real estate; correct?

7 A. Yes.

8 Q. What information do they provide about

9 the trust real estate?

10 A. Net income for calendar years. And

11 sometimes, as you can see, the recommendation

12 lines are filled in. Sometimes they weren't. They

13 were blank. So there was numbers and there is

14 verbalized written reports on these.

15 Q. And in later years those reports provided

16 appraisal values; correct?

17 A. Any specific year that you are talking

18 about?

19 Q. Well, there's a line for appraisal values

20 starting in --

21 A. There's a little box, appraisal information.

22 Q. Well, I see as far back as 1974, the very

23 first -- there's a present appraisal line. It's just

24 not filled in; right?

25

1 A. It's empty. It's blank, that line.

2 Q. Starting in 19 --

3 A. Many years of those lines are empty.

4 Q. In 1981, it's filled in, isn't it?

5 A. 1981, yes. There's a number for present

6 appraisal.

7 Q. So these are forms beginning in 1974 and

8 through -- what's the last year you have?

9 A. For Exhibit 64 --

10 Q. It looks like 2011.

11 A. Yes. 2011 is the most recent year on

12 Exhibit 64.

13 Q. So from 1974 through 2011, you were

14 provided with annual real estate reports concerning

15 the Oxmoor Farm property; correct?

16 MR. ZIELKE: Let me object. I think they

17 jumped. I saw one go to 2007, the interim that

18 were missing.

19 You have to go through and see if you

20 answered his question, if indeed you have one for

21 each one of those years.

22 BY MR. CORYELL:

23 Q. Let me strike the question and ask you a

24 different one. You have -- Exhibit 64 are real

25 estate annual reports; correct?

1 A. Yes.

2 Q. And those real estate annual reports

3 provide a lot of information, don't they?

4 A. Not the earlier ones. There are many

5 blanks.

6 Q. They provide information regarding the

7 annual income of the property; correct?

8 A. Yes.

9 Q. Providing the appraisal value of the

10 property; correct?

11 A. For some years, not all.

12 Q. Comments concerning the property;

13 correct?

14 A. Some of the reports do, but not all of

15 them.

16 Q. And these annual real estate reports you

17 understood were internal PNC documents, correct,

18 or Citizens Fidelity Bank documents; correct?

19 A. Yes.

20 Q. But they were shared with you; correct?

21 A. Yes.

22 Q. And they were shared with you because

23 you asked for them; correct?

24 A. Only at my request and insistence.

25 Q. To your knowledge, this is not material

1 that the trustee shared as a matter of course with

2 all of the beneficiaries, is it?

3 A. No.

4 Q. They gave it to you because you asked for

5 it.

6 A. Yes. But I wouldn't have received it if I

7 hadn't asked for it.

8 Q. Okay. But they never denied it, did they?

9 A. No, but I want to draw your attention to

10 WAT 0150.

11 Q. Well, Mr. Zielke can ask you some

12 questions about that if you want to talk about that.

13 But that question is not pending. I will ask you

14 about 0168 though, calling your attention to

15 WAT_0168.

16 A. I can't comment on 0150?

17 Q. I ask you to look at 0168.

18 A. I am looking at 0168.

19 Q. Whose handwriting is that at the bottom of

20 that document?

21 A. Mine.

22 Q. What does that mean?

23 A. Document order could refer to an order for

24 production of documents.

25 Q. So you don't know what that means. As

1 we sit here today, you are not able to interpret that
2 for me?
3    A.   I think it is an order for a production of
4 documents request, a document order.
5    Q.   From CFB, document order of July, August
6 1991.  I am sorry.  You are going to have to
7 interpret that for me.
8    A.   There was an order for production of
9 documents and that's what I think that means, it
10 came to me because of that.
11    Q.   Okay.
12        MR. ZIELKE:  Let him finish.
13    A.   I don't know why it says July and August.
14 But a document order is -- to me, that's what a
15 document order means:  order for a production of
16 documents.
17 BY MR. CORYELL:
18    Q.   Just so I understand, too, you would
19 receive these documents on an annual basis;
20 correct?
21    A.   At my request.
22    Q.   But in other words, in 1974, you requested
23 this document and they gave it to you in '74; right?
24        MR. ZIELKE:  What document are you
25

1 referring to?
2 BY MR. CORYELL:
3    Q.   I am just trying to figure out, did you get
4 all these documents at once or is this something
5 you got every year because you asked for it, Send
6 me the real estate annual report for this year?  Or
7 did you not have any of these until 2010?
8    A.   I will tell you.
9    Q.   Well, that's what I'm asking.
10    A.   Okay.  Let me answer.  I think, by maybe
11 the late eighties, I was trying to get background
12 history of the operation of this trust.  So, no, I
13 don't think I got a copy of the 1974 report in 1974.
14    Q.   Okay.  Fair enough.
15    A.   Some back years came in in a bunch, in a
16 package.  And then, beginning late eighties, early
17 nineties, then I tried to keep up with it every year
18 and request it year by year.
19    Q.   With respect to the trust real estate
20 reports that are Exhibit 64, you think that some
21 time in the late eighties you made a request for all
22 of these reports that they had ever generated;
23 correct?
24    A.   Yes.
25    Q.   And they gave you the reports at that

1 point in time from 1974 until 1980, whatever year
2 you asked for; right?
3    A.   Yeah, when I tried to get caught up.  And
4 then once I caught up, then every year, year to
5 year.
6    Q.   So from the late 1980s on you received
7 these trust annual real estate reports on a yearly
8 basis at the end of the year; correct?
9    A.   Yes, but I think I had to ask for them
10 every year.
11    Q.   To your knowledge, you are the only
12 beneficiary who did ask for them; correct?
13    A.   I think so.
14    Q.   Whose handwriting is this on the very
15 front of Exhibit 64, the very first page?
16    A.   Mine.  I am going -- it's a process of
17 elimination.  I would get some reports.  And then
18 as I received, as the years came in, I would cross
19 out the years one at a time.
20    Q.   Referring you back to Exhibit 63 --
21    A.   Right.
22    Q.   So Exhibit -- the first page of Exhibit 63
23 is the annual review form for the year 2000;
24 correct?
25    A.   Yeah, that is correct.

1    Q.   And you believe you received that form in
2 the year 2001?
3    A.   Probably.  Yeah, the year following.
4    Q.   So you received the form for the year
5 2000 somewhere around the time that the form was
6 generated; correct?
7    A.   I tried to.
8    Q.   Okay.  And in 2000, there were comments
9 on the year 2000 form; correct?
10    A.   Yes.
11    Q.   What does the very last sentence in the
12 comment block indicate?
13    A.   Starting with future?
14    Q.   Yes.
15    A.   Future development will require Bunsen
16 Parkway construction.  Oxmoor Farming
17 Corporation, Corp. farms undeveloped land.
18    Q.   So you saw that comment in 2001;
19 correct?
20    A.   I have a good habit that works most of the
21 time.  I try to date when I get documents.  And
22 since my files aren't here, when I -- this isn't a
23 hundred percent of the time, but most of the time
24 when I receive a document from various sources,
25 on the back I will date it and write who it came

1 from. But as you can see, they are all --
2 Q. Yeah, that's why I asked you to bring the
3 documents here today. Do you think that would be
4 on your document?
5 A. Probably most of them.
6 Q. If you had brought your documents with
7 you here today, would you be able to look and tell
8 me the answer to that question?
9 A. If I have written on the back of them.
10 Q. So would you agree with me, Mr. Watkins,
11 that somewhere in -- whenever you received this
12 document in the year late 2000, early 2001, you
13 would have reviewed this document?
14 A. Yes.
15 Q. So you knew in 2001 that PNC considered
16 future development to require -- future
17 development of the Oxmoor Farm to require Bunsen
18 Parkway construction; correct?
19 A. Well, that's what's written here. I may or
20 may not have agreed with that.
21 Q. You knew that PNC considered that future
22 development would require construction of Bunsen
23 Parkway.
24 A. It looks like that's what they were
25 thinking. They --

1 Q. And you knew that in 2001; correct?
2 A. Probably.
3 Q. Calling your attention to the next page,
4 which is WAT_0189.
5 A. All right.
6 Q. Would you read the comment? And this is
7 the 2001 annual review form; right?
8 A. Yes.
9 Q. You got this because you asked for it;
10 correct?
11 A. Yes.
12 Q. To your knowledge, you were the only
13 beneficiary who asked for it; correct?
14 A. Yes.
15 Q. So would you read the comments. And you
16 got this in late 2001 or early 2002; correct?
17 A. Probably.
18 Q. And so would you read the comments that
19 you read in late 2001 or 2002?
20 A. 2001 property comments -- there's also,
21 above that, 2000 property comments.
22 Q. You can read that if you want, but I am
23 asking you to read the 2001 property comments.
24 A. All right. The trustees have hired LDR
25 International, a highly regarded land planner, to

1 prepare a plan for the long-range development of
2 Oxmoor. This plan be will be presented for zoning
3 approval in the near future. Development will take
4 many years since a 15- to 20,000,000 road -- I
5 guess that means dollars, although it doesn't say
6 that -- a 15- to 20,000,000 road with two interstate
7 bridges has to be constructed.
8 Q. So you knew in late 2001 or early 2002
9 that PNC had hired LDR International to prepare a
10 long-range development plan; correct?
11 A. Yes.
12 Q. You knew that in 2002 that PNC intended
13 that the plan would be presented for zoning
14 approval in the near future; correct?
15 A. That's what it says.
16 Q. And you knew in 2002 that PNC believed
17 that a plan would take many years because it
18 required a 15- to $20,000,000 road project with two
19 interstate bridges; correct?
20 A. Yes.
21 Q. And you knew in late 2001 or early 2000
22 that PNC believed that bridge construction was
23 required to develop the property; correct?
24 A. Yes.
25 Q. And you knew that because you got this

1 internal record that showed that; correct?
2 A. Yes.
3 Q. And you got this internal record because
4 you asked for it.
5 A. Yes.
6 Q. Can you read the next annual review form
7 which is from 2002; right?
8 A. Yes.
9 Q. That's a document that was generated in
10 2002; correct?
11 A. Yes.
12 Q. And you received this document in late
13 2002 or 2003; correct?
14 A. Yes.
15 Q. And it talks about the development plan,
16 doesn't it?
17 A. Yes.
18 Q. And it talks about zoning approval,
19 doesn't it?
20 A. Yes.
21 Q. And it specifically says that the
22 development plan will not proceed until the bridges
23 are built for the Bunsen Parkway extension; right?
24 A. Yes.
25 Q. So you knew that in 2002; correct?

23 (Pages 86 - 89)

1  A.  Yes.
2  Q.  And you kept getting these forms through
3  2011, correct, even though the next form on Exhibit
4  63 is 2007.
5  A.  Yes.
6  Q.  This continues through 2011; right?
7  A.  '07, '08, '09, '10, '11.
8  Q.  And in every year in the form, the trustee
9  references that future development of the Oxmoor
10  Farm depends on Bunsen Parkway expansion,
11  doesn't it?
12  A.  That's what they wrote in their form.  This
13  is 2016.  A lot of money has been expended on LDR
14  International:  studies, fees to various entities.  I
15  want to know why so little has been done since
16  2001, 2002.
17  Q.  So you knew when you asked Ms.
18  Georgehead and later when you asked Mr. Couch
19  about the pace of development, you knew that the
20  trustee believed that construction of two bridges
21  and an expansion of Bunsen Parkway was required
22  for development to proceed, didn't you?
23  A.  According to their forms.
24  Q.  You had been provided with -- well, you
25  knew that's what they thought, didn't you?

1  Because you had gotten their forms; right?
2  A.  Yes.
3  Q.  But even though you knew that, you asked
4  them to provide you with an explanation for the
5  pace of development; right?
6  A.  Yes.
7  Q.  And you asked them to do that because
8  you were trying to get material for Mr. Zielke to
9  use in his lawsuit; correct?
10      MR. ZIELKE:  Objection.  Don't answer
11  that.
12      MR. CORYELL:  Are you instructing him
13  not to answer?
14      MR. ZIELKE:  Yes.  For that stupid
15  question?
16      MR. CORYELL:  Oh, Larry.  That's mean.
17  You don't have to be disrespectful.  Stupid is not a
18  very nice thing to say.
19      MR. ZIELKE:  It was a stupid question.
20      MR. CORYELL:  Well, that's not a very
21  nice thing to say.
22  BY MR. CORYELL:
23  Q.  Referring you back to Exhibit 64 --
24  A.  All right.
25  Q.  -- and WAT_190, Page 195.

1  A.  All right.
2  Q.  There's a handwritten comment there.  Is
3  that your handwriting?
4  A.  Yes.
5  Q.  What does that comment mean?
6  A.  I think it's the PNC Bank branch lease
7  property, 8000 Shelbyville Road.
8  Q.  Are we talking about the same thing, 195?
9  A.  Yes.
10  Q.  So, can you read for me what --
11  A.  I am sorry.  Let's see.  Let me back up
12  because there is a number in there that is similar
13  to the bank branch, but -- no, the 21 -- uh, let me
14  think for a second.  This is probably the back of
15  194.
16  Q.  I am just asking you to read your
17  handwritten comments for me.
18  A.  All right.  Appraised at 21 m.
19  Q.  What does that mean?
20  A.  Million.
21  Q.  Okay.
22  A.  Leases should total 2.1 m equal 10%
23  return.  Leases totals 2,447,647 equal 11.5%
24  return.
25  Q.  What's that mean?

1  A.  That 2,447,647 is a larger number than
2  2.1.
3  Q.  Is that good or bad?
4  A.  It's good.
5  Q.  So you are happy about that?
6  A.  These numbers that show -- so, yes.
7  Q.  That's something that -- does PNC get
8  credit for that or is that --
9  A.  For that much development.
10  Q.  I am referring you to document WAT_201.
11  So WAT_201, which is part of Exhibit 64, you were
12  given that form in 2005; correct?
13  A.  Maybe 2006.
14  Q.  Early 2006?
15  A.  It's for the year 2005.
16  Q.  This is an internal PNC document; right?
17  A.  Yes.
18  Q.  You were given this because you asked for
19  it; correct?
20  A.  Yes.
21  Q.  And what does this document indicate with
22  respect to the appraised value of the property?
23  A.  There is an appraisal date.
24  Q.  Well, let me point you to something.
25

24 (Pages 90 - 93)

1 [WHEREUPON, a lunch recess is taken.]
2 BY MR. CORYELL:
3   Q.   Mr. Watkins, we are back from our lunch
4 break.  In addition to the information that we talked
5 to before lunch that was provided to you regarding
6 development, the trustee also provided you with
7 other information concerning the property and the
8 assets in the trust on a regular basis, didn't it?
9   A.   Yes.
10  Q.   And I am handing you a document -- well,
11 strike that.  Would you agree with me, Mr. Watkins,
12 that you have been provided with thousands of
13 pages of documents over the years regarding the
14 assets of the William Marshall Bullitt Trust?
15  A.   Yes.
16  Q.   Would you agree with me that you have
17 been provided with tens of thousands of pages of
18 documents over the years?
19  A.   How many years?
20  Q.   Well, over the history of your trust.
21  A.   I think that number is a little high.
22  Q.   Would you agree with me that in the last
23 eight years -- let's say since 2008 -- you have
24
25

1 been provided with thousands of pages of
2 documents concerning the assets in the William
3 Marshall Bullitt Trust?
4   A.   The quarterly beneficiary reports are
5 about 12 or 15 pages.  There's 50 or 60 pages.
6 Eight years is 400 -- 480.  Monthly rent report,
7 that's 12.  A copy of the fiduciary tax return -- what
8 was that -- a hundred pages a year, eight years,
9 2008 to '15 or '16, that's 800 pages.  And some
10 correspondence and all -- maybe less than a
11 thousand pages in the last years.
12  Q.   Okay.  Would you agree with me that over
13 the last eight years you have been provided with at
14 least hundreds, if not thousands, of pages of
15 documents concerning the assets in the William
16 Marshall Bullitt Trust?
17  A.   Not thousands.  I think at the most a
18 thousand.  It would be a stretch to go pretty much
19 over a thousand.
20  Q.   And would you agree with me that many of
21 those documents were provided just to you because
22 you requested?
23  A.   No, a minority number of pages.  Most of
24 the quarterly reports that all the beneficiaries get,
25 that's the largest single document four times a

1 year.
2   Q.   Let's just go forward then and we'll figure
3 this out together, all right?
4   A.   All right.
5 [WHEREUPON, document is marked Exhibit 65
6 for identification.]
7 BY MR. CORYELL:
8   Q.   I have given you Exhibit 65.  I am handing
9 you a document that we've marked as Exhibit 65.
10 Can you tell me what that document is?
11  A.   The monthly rent reports of -- from the
12 ground leases.
13  Q.   This is a document that was included in
14 the material that you produced to us in this
15 litigation; correct?
16  A.   Yes.
17  Q.   Who gave these documents to you?
18  A.   It would be Jim Couch, Beargrass Realty.
19  Q.   So PNC.
20  A.   Yes.
21  Q.   You got this information.  You got this
22 document, these reports from PNC; correct?
23  A.   Yes.
24  Q.   And would you agree with me that these
25 are internal reports?

1   A.   Yes.
2   Q.   Would you agree with me that these are
3 reports that are not provided to beneficiaries in the
4 ordinary course?
5   A.   Yes.
6   Q.   Would you agree with me that they were
7 provided to you because you asked for them?
8   A.   Yes.
9   Q.   To your knowledge, did any other
10 beneficiary ask for them?
11  A.   Not to my knowledge.
12  Q.   And so what is your understanding of what
13 is shown in these -- should we call them monthly
14 rent sheets?  Because that's how you've identified
15 them; right?
16  A.   Well, right there, 7/31/2008.
17  Q.   Sure.
18  A.   And I write the month July.
19  Q.   Right.  I was talking about -- should we
20 call them monthly rent sheets?
21  A.   Yes.
22  Q.   Okay.  So what is a monthly rent sheet
23 and what do they show?
24  A.   The rent paid by each lessee on the
25 different various ground leases on Oxmoor, William

27 (Pages 102 - 105)

1 Marshall Bullitt Trust.
2 Q. So this is a cash flow statement.
3 A. Yes.
4 Q. And it shows the amount of rent that is
5 paid for each piece of property that is leased to
6 somebody by the trust; correct?
7 A. Yes.
8 Q. And you get these on a monthly basis;
9 right?
10 A. Yes.
11 Q. And you get them routinely; correct?
12 A. Yes.
13 Q. So that you will get one -- you will get
14 these every month after it's generated; right?
15 A. Yes.
16 Q. So and these sheets, I assume, you got
17 them at the time or about the time they were
18 generated; right?
19 A. Yes.
20 Q. So let me ask you to look at document
21 860, which is the cash flow statement for January
22 of 2008; right?
23 A. Correct.
24 Q. That is Bates stamped 860.
25 A. Yes.

1 Q. I will represent to you that this is the way
2 that these documents came to me. The next
3 document in order is Bates stamped 862.
4 A. But it is February of -- 2/27/2008.
5 Q. So my question to you is, do these
6 documents have a back side? Is there information
7 on the back side of these records?
8 A. There might be. I am glad you asked that.
9 This is just what I was talking about earlier. Do
10 you see how I said I marked documents there?
11 Q. I get it. And I am not saying that anybody
12 did anything wrong. I am not accusing anybody of
13 doing anything wrong. I am asking you so that I
14 know.
15 A. I may have and I may have written J.
16 Couch on the back just like this is Steve Mercer on
17 this document.
18 Q. Okay. All right.
19 A. But earlier you were on me about I didn't
20 bring the records over here. Well --
21 Q. Earlier I asked you why you didn't produce
22 the email between you and Ms. Georgehead, why
23 that wasn't included in your production.
24 A. Well, you made a comment about when I
25

1 said I date my -- when I receive documents on the
2 back and who they are from. And then you said,
3 Well, we'd have that if you brought your records
4 with you.
5 Q. Yeah.
6 A. Why didn't someone copy the back of
7 these?
8 Q. I think that's a question that's more
9 appropriately directed to your counsel. I didn't -- I
10 never had those documents to copy. I know what I
11 asked for and I know that I asked for complete
12 copies of the documents to be --
13 MR. ZIELKE: Do you know what I don't
14 understand, Corky, seriously? The Bates stamps
15 are -- it goes from -- for example, in Exhibit 65, it
16 goes WAT_0860. The next page is 62. The next
17 page is 64.
18 MR. CORYELL: I did not Bates stamp or
19 copy them, Larry. All I know is there was a stack
20 of --
21 MR. ZIELKE: It is telling me that there is
22 another page in between each one of these --
23 MR. CORYELL: That's what I'm asking.
24 MR. ZIELKE: -- that we Bates stamped.
25 Because we wouldn't skip -- I guess when it went

1 out to the copy people, I am assuming now they
2 jumped over the second page, the back page, I am
3 assuming.
4 MR. CORYELL: I am just asking. I'm not
5 saying that -- you know, accidents happen. I am
6 not accusing anybody of doing anything wrong. I
7 am just asking the question.
8 THE WITNESS: There's one right there.
9 See?
10 BY MR. CORYELL:
11 Q. Can -- again, all of these monthly rent
12 sheets were documents prepared by PNC and they
13 were internal documents; right?
14 A. Yes, William M. Bullitt, prepared for owner
15 and then Beargrass Realty, Inc. right under that,
16 which is Jim Couch's company for the management.
17 Q. And these are documents that you
18 specifically requested.
19 A. Yes.
20 Q. And that request was honored.
21 A. Yes.
22 Q. Every month.
23 A. No. Here -- here is Exhibit 64.
24 Q. Uh-huh.
25

1 Kohl's missing, equals two. OCC missing. That's
2 Oxmoor Country Club. So you can see some
3 months.
4 Q. Two where the Oxmoor Country Club was
5 missing. What is the Oxmoor Country Club rent?
6 Do you know how much it is?
7 A. This one shows 8,000.
8 Q. So you know how much the Oxmoor
9 Country Club rent is; right?
10 A. One month showed 8.
11 [WHEREUPON, document is marked Exhibit 66
12 for identification.]
13 BY MR. CORYELL:
14 Q. I hand you a document we've marked as
15 Exhibit 66.
16 A. Yeah, another month has 8. And then
17 there were two payments in July of 2008, but they
18 add up to 8,000. So, you know, it would be 96 a
19 year, eight times 12 for at least that year in 2008.
20 Q. So Exhibit 65 is a list with a specific
21 breakdown of lease payments on a monthly basis in
22 2008; correct?
23 A. Yes.
24 Q. And Exhibit 66, which I've just handed
25 you, is the same information from 2009 through

1 2014; correct?
2 A. I see '14. I see '13. It looks like it's all
3 here. Here's '12 and '11, '10. This looks like it's
4 six years: '09, '10, '11, '12, '13, '14.
5 Q. And these are at least 12 pages a piece;
6 correct?
7 A. Yes.
8 Q. So there's 12 pages a year for what, six
9 years?
10 A. 72.
11 Q. So 72 pages just in the monthly rent
12 reports for all of the leases on the Oxmoor
13 property; correct??
14 A. Correct.
15 Q. And again, those were provided to you
16 and, to your knowledge, no other beneficiary
17 because they didn't ask for them; correct?
18 A. Correct.
19 [WHEREUPON, document is marked Exhibit 67
20 for identification.]
21 BY MR. CORYELL:
22 Q. I am handing you a document that we have
23 marked Exhibit 67. Can you tell me what Exhibit 67
24 is?
25 A. Equity trades in the William Marshall

1 Bullitt Trust account.
2 Q. Do you call them buy-sell reports?
3 A. Yes.
4 Q. This is another document that was
5 produced by you in this litigation; correct?
6 A. Yes.
7 Q. Where did you get this document?
8 A. PNC Wealth Management. Probably Mary
9 Helen Myles.
10 Q. What does the buy-sell report that you're
11 looking at, Exhibit 67, reflect? What is it?
12 A. The year 2008.
13 Q. No, but what is it? What is your
14 understanding of the information that is in it?
15 A. Equities that are purchased or sold for the
16 William Marshall Bullitt Trust account.
17 Q. It relates to the assets in the William
18 Marshall Bullitt Trust other than real property
19 assets?
20 A. Yes, equities.
21 Q. So there are --
22 A. Well, paper equities, not land.
23 Q. Stocks and bonds.
24 A. True. There's some funds in here, the
25 Harbor Fund.

1 Q. Securities or non-real property
2 investments of the William Marshall Bullitt Trust;
3 correct?
4 A. Yes.
5 Q. So in addition to getting information about
6 the real property investments of the William
7 Marshall Bullitt Trust, you were also provided with
8 information concerning the non-real property
9 investments in the William Marshall Bullitt Trust;
10 correct?
11 A. Yes.
12 Q. And you got these buy-sell reports even
13 before 2008, didn't you?
14 A. Yes.
15 Q. And you got them from Mary Helen Myles
16 who works for PNC; correct?
17 A. Yes.
18 Q. And you got this information because you
19 asked for it; correct?
20 A. I am not sure I did ask for these requests.
21 Just --
22 Q. These are addressed to you.
23 A. Yeah, but they may have initiated this on
24 their own.
25 Q. To your knowledge, did any other

1 beneficiary get these reports?
2   A.   I don't know.  To my knowledge, I don't
3 know.
4   Q.   Next.
5   A.   Yeah.
6 [WHEREUPON, document is marked Exhibit 68
7 for identification.]
8 BY MR. CORYELL:
9   Q.   I am handing you a document we have
10 marked as Exhibit 68.  Can you tell me what that
11 is?
12   A.   It looks like more of the same for the next
13 year, 2009 buy-sell report.
14   Q.   So you got -- Exhibit 68 is the buy-sell
15 reports through 2000 -- it looks like '12; correct?
16   A.   Well, the highest date I see in here is May
17 of 2011 on the last page, 1485.  Now, if they didn't
18 buy or sell something in a calendar month, then, of
19 course, there would be no sheet for that month.
20 But it looks like most months there was some
21 activity.
22   Q.   What is WAT_0348?
23   A.   What number?
24   Q.   It's the very last document on there, 348
25 through 350.

1   A.   It has 2006 to 2035.
2   Q.   Are you looking at 348?
3   A.   No, 350.
4   Q.   348, please.
5       MR. ZIELKE:  You said 350.
6       MR. CORYELL:  Correct.  I am just asking
7 him to tell me how he keeps his records.
8 BY MR. CORYELL:
9   Q.   This is your handwriting, isn't it?
10   A.   Yeah.
11   Q.   What did you put?  Is that your
12 handwriting on 348?
13   A.   Yes, 2012 buy-sell reports.
14   Q.   And then apparently in that -- is that an
15 envelope?
16   A.   Yes.
17   Q.   In that envelope, it appears that you had -
18 - you had put WAT_0349 and 350.
19   A.   Yeah, this has to do with a long-term
20 lease.  There's no buy-sell reports after this page.
21   Q.   Do you believe that you got buy-sell
22 reports in 2012?
23   A.   I think so.
24   Q.   Do you have any explanation for why
25 those weren't produced?

1   A.   No.
2   Q.   In any event, you believe that you
3 received these buy-sell reports from 2008 through
4 at least 2012; correct?
5   A.   Yes.
6   Q.   Do you believe you received them after
7 2012?
8   A.   They may go into 2013, but I would have
9 to look at my records.
10   Q.   Okay.  So that's another what, maybe 50
11 pages?
12   A.   I don't know.  They could have one
13 transaction a month, two in a month, maybe three
14 in a month.
15   Q.   How many pages did we just look at?
16   A.   Which year?
17   Q.   The last two exhibits.
18   A.   Here's 2008.  I can start with a number:
19 724 to 732.
20   Q.   There's eight.  How about the next
21 exhibit?  No, that one.
22   A.   I am sorry.  Well, this is the cover page.
23 1097 to 1485.  But the number sequence is
24 completely different, 348, 349, 350.
25   Q.   Count the pages for me, please.

1   A.   It's three pages.
2   Q.   Count the pages of that entire exhibit.
3   A.   All right.  38.
4   Q.   38 and 8 -- that one was 8; right?  That's
5 46.
6   A.   Yeah.
7   Q.   So that's about 50 pages; right?  So that's
8 about another 50 pages of buy-sell reports over the
9 last six years; correct?  And that doesn't even
10 include the buy-sell reports that you think you have
11 for 2012 and 2013; right?  So there's another 50
12 pages; correct?
13   A.   Yes.
14 [WHEREUPON, document is marked Exhibit 69
15 for identification.]
16 BY MR. CORYELL:
17   Q.   I am handing you a document we have
18 marked Exhibit 69.  These are out of your files;
19 correct?
20   A.   Yes.
21   Q.   You produced these; right?
22   A.   Yes.
23   Q.   So you had them; right?
24   A.   Yes.
25   Q.   What are these?  What is Exhibit 69?

1    A.   Tax returns, federal and state, 1041, 741.
2    Q.   For the William Marshall Bullitt Trust;
3 correct?
4    A.   Yes.
5    Q.   And the trustee provided you with copies
6 of these tax returns; correct?
7    A.   Yes.
8    Q.   Now, these tax returns are just from 2008
9 through 2014; right?
10   A.   I don't see 2010.  '08, '09, '11, '13 and
11 '14.  Yeah, I don't see '12.
12   Q.   Can I see the exhibit, please?
13   A.   Yeah.  There's one or two years skipped.
14   Q.   What year is that?
15   A.   2008.
16   Q.   What year is that?
17   A.   That's 2009.
18   Q.   What year is that?
19   A.   Wait.  There's 2010.
20   Q.   Thank you.
21   A.   Some are federal and some are state:
22 2011, 2012, 2013, 2014 -- and 2014.
23   Q.   Is that a duplicate of the one you just put
24 on top?
25   A.   Yes, the numbers check.  They are the

1 same, two 1041s, 2014.
2    Q.   Can you restack those?  I will take the
3 duplicate back.  Let's throw that away.
4    A.   There's rubber bands around it.
5    Q.   Now, my question to you was, these are --
6 I asked you isn't it true that these are the tax
7 returns for the William Marshall Bullitt Trust from
8 2008 through 2014.  And what's your response to
9 that question?
10   A.   If there's a state and federal for each
11 year.
12   Q.   And these tax returns, Exhibit 69, were
13 provided to you by the trustee; correct?
14   A.   Yes.
15   Q.   To your knowledge, did any other
16 beneficiary request copies of the tax returns?
17   A.   Not to my knowledge.
18   Q.   And you got these tax returns even before
19 2008, didn't you?
20   A.   Yes, I think I have years before that.
21   Q.   And to the best of your knowledge, you
22 were the only beneficiary who received these tax
23 returns; right?
24   A.   Yes.
25   Q.   And the reason you received these tax

1 returns is because you asked for them; right?
2    A.   Yes.
3    Q.   And the trustee gave them to you.
4    A.   Yes.
5    Q.   Would you agree with me that that's
6 several hundred pages of documents?
7    A.   Yeah.  300 pages, more or less.
8 [WHEREUPON, document is marked Exhibit 70
9 for identification.]
10 BY MR. CORYELL:
11   Q.   I am handing you a document we have
12 marked Exhibit -- or a compilation of documents we
13 have marked Exhibit 70.  These documents are from
14 your file; correct?
15   A.   Yes.
16   Q.   And there's two Bates stamps on these, at
17 least on the first one, isn't there?
18   A.   Yes.
19   Q.   There's a Bates stamp WAT_0220, which I
20 guess is related to this case; right?
21   A.   Yes.
22   Q.   What's the other one?
23   A.   Related to a prior case.
24   Q.   What case is that?  Do you know?
25   A.   I think a 1989 case which I started and

1 then was joined by three co-plaintiffs within a
2 month.
3    Q.   So these documents that you produced or
4 at least some of the documents you produced here
5 today bear multiple Bates stamps because they
6 have been produced in multiple litigation matters;
7 correct?
8    A.   One prior case.
9    Q.   Now, what is Exhibit 70?
10   A.   The income to the William Marshall Bullitt
11 Trust and expenses, annual --
12   Q.   I didn't mean to interrupt you, but it's a
13 form, isn't it?
14   A.   Yes, from the first corporate trustee real
15 estate department.
16   Q.   It's called an annual operating statement;
17 correct?
18   A.   Yes, with income and expenses to the
19 Marshall Bullitt Trust.
20   Q.   So this is an annual operating statement
21 which is an income statement; right?
22   A.   And expenses.
23   Q.   For the assets of the William Marshall
24 Bullitt Trust; right?
25   A.   Yes.

32 (Pages 122 - 125)

1 Q. Where did you get this form?
2 A. Probably PNC Bank. Because the
3 corporate trustee changed in 1986 and I think I
4 began my records collection in -- like I testified to
5 earlier, late eighties or early nineties.
6 Q. So as I understand your prior testimony,
7 sometime in the late eighties you were interested
8 in getting these forms and these reports for all the
9 years previous; correct?
10 A. To get a -- you might say a financial
11 history of my grandfather's trust.
12 Q. And the trustee gave you all those forms.
13 A. Well, not -- it looks like 1974 is the
14 earliest one. This trustee, Citizens Fidelity
15 qualified in 1961.
16 Q. So they gave you the forms from 1974
17 until whenever in the late 1980s that you asked for;
18 correct?
19 A. If no years are skipped in here. I think
20 it's fairly complete, more or less complete.
21 Q. And then they gave you this form every
22 year for the subsequent years; correct?
23 A. I think up until recently, maybe three
24 years ago.
25 Q. Yeah, these forms cover every year from

1 1974 to 2010, it looks like.
2 A. Yeah. See, 288 is December of 2010.
3 Q. So through 2010, at least, you were given
4 an income statement or an annual operating
5 statement that showed the income and the
6 expenses for the William Marshall Bullitt assets
7 every year; correct?
8 A. Yes.
9 Q. And you were the only beneficiary that got
10 this report; correct?
11 A. To my knowledge.
12 Q. And the reason that you got this report is
13 because you asked for it; correct?
14 A. Yes.
15 Q. Isn't it true that this is an internal report?
16 A. Yes.
17 Q. It's not a report that would be provided to
18 the beneficiary or any beneficiary in the ordinary
19 course; correct?
20 A. I think beneficiaries are entitled to these
21 reports.
22 Q. I understand that. But do you understand
23 that -- would you agree with me that this form is
24 not provided to beneficiaries in the ordinary
25

1 course?
2 A. Correct.
3 Q. It was only given to you because you
4 asked for it.
5 A. Yes.
6 Q. And to your knowledge, no other
7 beneficiary asked for it.
8 A. To my knowledge.
9 Q. And these forms provide detailed
10 information about the income and expenses
11 generated by the William Marshall Bullitt property,
12 don't they?
13 A. Yes, which, once again, shows I am a
14 more interested beneficiary than the others.
15 Q. I don't think there's any dispute that you
16 are more interested.
17 A. Highly interested.
18 Q. And that's what, a hundred pages?
19 A. It's one page a year.
20 Q. Yeah, just from 2000, with Exhibit 70, is a
21 hundred pages. But if it's just one page a year
22 since 2009, it's more like, what, 15 pages?
23 A. 220 to 289.
24 Q. So there's 15 pages.
25     MR. ZIELKE: Can we stop and take a

1 quick break?
2     MR. CORYELL: Let me do this first.
3 [WHEREUPON, document is marked Exhibit 71
4 for identification.]
5 BY MR. CORYELL:
6 Q. I am handing you a document that we have
7 marked as Exhibit 71.
8 A. Yeah.
9 Q. What is Exhibit 71?
10 A. Summaries of leases on Oxmoor William
11 Marshall Bullitt Trust property.
12 Q. So these are summaries of the leases that
13 are in effect at various times on the William
14 Marshall Bullitt Trust property; correct?
15 A. Yes.
16 Q. And you received this information from
17 PNC on a regular basis, didn't you?
18 A. Only because I requested it.
19 Q. And when you requested it, they provided
20 it, didn't they?
21 A. Yes.
22 Q. This covers what years, Exhibit 71?
23 A. Well, it's not years. Each lease has its
24 own beginning year and ending year and they are
25 all different.

33 (Pages 126 - 129)

1  Q.  What period of time do the documents that
2  are in Exhibit 71 cover?
3  A.  It's not that way.  It's not done like that.
4  These leases have start and stop years.  It's not
5  years like something that's produced annually.
6  Q.  Let me call your attention to the very first
7  page of this exhibit, WAT_0458.  There are some
8  numbers on the side on -- are you looking on the
9  first page?  It's the very first page of this exhibit.
10  A.  I am sorry, 458.
11  Q.  What are those numbers?
12  A.  Down the right side, these numbers here?
13  Q.  Yes.
14  A.  Years.
15  Q.  Why is there a check next to each one?
16  A.  Oh, because annually they prepare a lease
17  summary.  They -- there seems to be five years.
18  There's a cover page that starts each year and it
19  says January 1st of like 2010 and then January 1st,
20  2011, 2012.  These are the lease summaries, but
21  not the cover for that year's package.
22  Q.  Do you have the lease summaries for all
23  the years that are checked on the right side of
24  document 0458?
25

1  A.  It appears so.  That's my writing and my
2  check marks.
3  Q.  So you believe you have all the lease
4  summaries for the years from 2000 through 2012;
5  correct?
6  A.  I think so if they are checked off.
7  Q.  What is a lease summary?
8  A.  Who the tenant is, the lessee.
9  Q.  It summarizes the lease, lease by lease?
10  A.  The lease premises.
11  Q.  Provides detailed information for each
12  lease on the William Marshall Bullitt property;
13  correct?
14  A.  The term, the rent and the extended
15  terms.
16  Q.  You would agree with me that that's an
17  internal PNC document, isn't it?
18  A.  Yes.
19  Q.  That's not a document that would typically
20  be provided to the beneficiaries in the ordinary
21  course, would it?
22  A.  Yes.
23  Q.  To your knowledge, no other beneficiary
24  asked for it, did they?
25  A.  Not to my knowledge.

1  Q.  So this information was provided to you
2  because you asked for it; correct?
3  A.  Yes.
4  Q.  How many pages would you think this
5  compilation of documents is?
6  A.  Well, if there's no skips in the Bates
7  numbers, 388 to 457.
8  Q.  90?  70?
9  A.  57 and 12 is 69, plus one, so --
10  Q.  These are all documents that were
11  prepared by PNC folks; right?
12  A.  Yes, and/or Beargrass Realty.
13      MR. CORYELL:  Okay.  All right.  Let's
14  take a break.
15  [WHEREUPON, a brief recess is taken.]
16  BY MR. CORYELL:
17  Q.  I am going to stand over here, Mr.
18  Watkins, just because I want to look through this at
19  the same time you are looking through it.  Is this
20  okay?
21  A.  Yeah, that's fine.
22  Q.  Okay.  I don't mean to invade your space
23  or anything.  Okay.  So, over the last -- well, strike
24  that.  Since 2008, and in some cases even before
25  that --

1  A.  True.
2  Q.  -- you have been provided with real estate
3  department annual reports that provide information
4  on the value of the property, the appraised value of
5  the property and comments concerning the plans on
6  the property on an annual basis; correct?
7  A.  Yes.
8  Q.  And those reports consist of dozens of
9  pages; correct?
10  A.  Yes.
11  Q.  In addition to that, since 2008, you have
12  been provided with monthly rent sheets concerning
13  the property; correct?
14  A.  Yes.
15  Q.  And those monthly rent sheets provide
16  information concerning the cash flow of the leased
17  property that is part of the William Marshall Bullitt
18  Trust; correct?
19  A.  Yes.
20  Q.  And those monthly rent sheets consist of,
21  in the last five years, ten or 20 pages; correct?
22  A.  Yes.
23  Q.  And in addition to that, you have been
24  provided with monthly rent reports that we have
25  seen marked as Exhibit 66; correct?

1    A.   Yes.  That's Exhibit 66.
2    Q.   And those reports were provided.  To the
3 best of your knowledge, those reports were
4 provided only to you; correct?
5    A.   Yes.
6    Q.   And those reports consist of, for the last
7 eight years, dozens of pages; correct?
8    A.   Yes.
9    Q.   And in addition to that, you have been
10 provided with buy-sell reports; correct?
11    A.   Yes, for some years.
12    Q.   And those reports consist of ten to 20
13 pages; correct?
14    A.   Yes.
15    Q.   And in addition to that, you have been
16 provided with the tax returns for the William
17 Marshall Bullitt Trust; correct?
18    A.   Yes.
19    Q.   Those tax returns consist of several
20 hundred pages; correct?
21    A.   Yes.
22    Q.   And to your knowledge, you are the only
23 beneficiary who requested those tax returns;
24 correct?
25    A.   Yes.

1    Q.   And in addition to that, you have been
2 provided with annual operating statements;
3 correct?
4    A.   Yes.
5    Q.   Those annual operating statements
6 consist of multiple pages of information concerning
7 the income and expenses of the trust property;
8 correct?
9    A.   Yes.
10    Q.   And to the best of your knowledge, you
11 are the only beneficiary provided with those annual
12 operating statements; correct?
13    A.   Yes.
14    Q.   And in addition to that, you have been
15 provided with lease summaries; correct?
16    A.   Yes.
17    Q.   Summaries of all the leases on the
18 Oxmoor, the William Marshall Bullitt property;
19 correct?
20    A.   Yes.
21    Q.   And to the best of your knowledge, you
22 are the only beneficiary who has requested those
23 lease summaries; correct?
24    A.   Yes.
25 [WHEREUPON, document is marked Exhibit 72

1 for identification.]
2 BY MR. CORYELL:
3    Q.   Let me hand you a document that we have
4 marked as Exhibit 72.
5    A.   All right.  Yeah, 72.
6    Q.   This is Bates stamped WAT_1975;
7 correct?
8    A.   Correct.
9    Q.   We are looking at the same thing?
10    A.   Yes, we are.
11    Q.   What is Exhibit 72?
12    A.   It's a line chart showing the performance
13 of the Bullitt Trust.
14    Q.   Who prepared it?
15    A.   Well, this one, M. H. Myles, PNC.  And
16 that's my notation.
17    Q.   That's Mary Helen Myles?
18    A.   Yes.
19    Q.   So Mary Helen Myles prepared this?
20    A.   Yes, sir.
21    Q.   Did she prepare this at your request?
22    A.   I will give you a little history on these.
23 Publicly traded corporations have annual reports.
24 And they will show how their stock -- on a page, a
25 little chart -- how their stock did against the major

1 indexes.  This is where I got the idea to request of
2 the trustee charts like this.
3    So it began by a predecessor of Mary Helen
4 Myles.  And he was the -- you might say the
5 investment man in the Trust Department of the
6 William Marshall Bullitt Trust and all the trusts at
7 Citizens Fidelity Bank.  And I think he retired after
8 PNC bought out the bank in 1986 -- Jim Kinsman.
9 So he began these charts and he started in 1989.  I
10 think I wanted to go back earlier, but I don't think
11 he would.
12    So he did it for several years and then Mary
13 Helen Myles, I think, just kind of took over, after
14 he retired, where he left off and kept sending them
15 to me.
16    Q.   So this was a document that was
17 specifically prepared for you; correct?
18    A.   Yes.
19    Q.   At your request?
20    A.   Yes.
21    Q.   That PNC wouldn't have even normally
22 prepared; correct?
23    A.   Yes.
24    Q.   So they did this as a special
25 accommodation or response to you; right?

1  A.  Yes.
2  Q.  This is not work that they would normally
3  do; right?
4  A.  No, and --
5  Q.  They ordinarily wouldn't make this chart,
6  would they?
7  A.  Probably not.
8  Q.  But they did it because you asked them to
9  do it; right?
10  A.  But I wouldn't know if they have gotten
11  requests from other beneficiaries and other trusts
12  or still to this day this is the only one.  I don't
13  know.
14  Q.  To your knowledge, they haven't gotten
15  requests from beneficiaries and other trusts to
16  make a chart like this; correct?
17  A.  No.
18  Q.  And to your knowledge, this is the only
19  trust that they do this on, isn't it?
20  A.  Yes.
21  Q.  They did this because you asked them.
22  And it was a special exercise for them, yes?
23  A.  Yes.
24  Q.  And you started asking Mr. Kinsman back
25  in the late eighties or early nineties; right?

1  A.  Yes.
2  Q.  And Ms. Myles, who took over for Mr.
3  Kinsman when he retired in the early or mid
4  nineties, continued to do this because you asked
5  her to continue to do it; right?
6  A.  Or just automatically she just continued
7  sending them to me like he did.  One or the other.
8  Q.  What are the two charts that are the
9  second and third page of Exhibit 72?
10  A.  These are the numbers that create these
11  lines.  So, you know, a picture is worth a thousand
12  words.  A person who is good at numbers can see
13  generally what that chart shows.  But it sure makes
14  it a lot easier when you have those lines, lines that
15  are created from these numbers.
16  Q.  To your knowledge, did any other
17  beneficiary of the William Marshall Bullitt Trust
18  received this chart?
19  A.  Not to my knowledge.
20  Q.  To your knowledge, did any other
21  beneficiary of the William Marshall Bullitt Trust ask
22  for a chart like this?
23  A.  Not to my knowledge.  I could have
24  prepared a chart like this myself, but I would rather
25  have the trustee do it, and I am glad they

1  did.  And they never complained.
2  Q.  That was nice of them, wasn't it?
3  A.  Yes, it was nice.  And they never
4  complained about furnishing me these copies of 15
5  to 20 pounds and more.
6  Q.  The stack of documents that we just
7  looked through that --
8  A.  Not one complaint from them, not a word.
9  Q.  Hold on a minute.  I just want to make
10  sure that I understand what you are saying.  The
11  stack of documents that we just looked through, all
12  these reports that had all this information, you
13  would say that's ten pounds worth of paper?
14  A.  Or more.
15  Q.  And did PNC ever complain about
16  providing this information to you?
17  A.  No, they did not.
18  [WHEREUPON, document is marked Exhibit 73
19  for identification.]
20  BY MR. CORYELL:
21  Q.  Did they ever complain about providing
22  Exhibit 72 or 73 to you?
23  A.  They never called and complained about
24  making a copy of any document or report.
25  Q.  What is Exhibit 73?

1  A.  Well, 1989 to 2013.
2  Q.  Okay.
3  A.  That's the span of years.
4  Q.  So it looks like Exhibit 73 is similar to
5  Exhibit 72, except Exhibit 72 has an additional
6  year; is that right?
7  A.  Yes.
8  Q.  So 72 goes through 2014.
9  A.  Yes, one year is added in 72.  Exhibit 72,
10  then what Exhibit 73 shows.
11  Q.  So I have got these reversed?
12  A.  It's a lower exhibit number, but it's a later
13  -- the next year.
14  Q.  All right.  I've got you.  Let's look back at
15  Exhibit 72 then since that's the latest year.
16  Calling your attention to the third page of Exhibit
17  72, which is Bates stamped 1977.
18  A.  I see it, 1977.
19  Q.  Uh-huh.  What does that table indicate
20  with respect to the value of the real estate for the
21  William Marshall Bullitt Trust in 1989?  And I think
22  you have to go back to the page in front of that to
23  get the years.
24  A.  Yeah.  Sure thing.  Well, yeah.  On Page
25  1976, Number 3 --

1  put with your papers to keep it organized by year;
2  is that correct?
3     A.  Yes, the quarterly reports are by years,
4  calendar years, the tax returns, the rent reports,
5  the rents received.  I use business-size envelopes
6  to keep them there.
7     Q.  And there's some calculations on this
8  envelope; right?
9     A.  Yes.
10    Q.  And what are these calculations?
11    A.  Lots of numbers.
12    Q.  It looks like you are calculating fees
13  there.
14    A.  That's one area.  There's different areas
15  that have different numbers on it.
16    Q.  Can you tell me generally what these
17  numbers are?
18    A.  Well, you mentioned fees.  There's income
19  fees: first, second, third, fourth quarter that I
20  picked up right off of the four quarter reports:  30,
21  30, 29, 30.  That adds up to 119,000.
22    Q.  All right.  And that's in these reports?
23    A.  Yes.
24    Q.  So you just kind of pulled those numbers
25  out of these reports?

1     A.  Yes, those numbers come from the
2  reports.
3     Q.  Very good.  Tell me what else.
4     A.  LV means land value of 44 m, kind of in
5  the middle of the page.
6     Q.  Uh-huh.
7     A.  EQ that means equity, meaning stocks and
8  bonds, 5, 5,000,000, 5 m.  These are probably off
9  the fourth quarter report, December, because it's
10  end-of-the-year numbers.
11    Q.  Okay.  So it's my understanding, too, that
12  you got -- we are looking at 2008, but it's my
13  understanding that you got these quarterly reports
14  even prior to 2008; correct?
15    A.  No.  They can only come at the end of
16  each quarter.
17    Q.  No, no.  I am showing you 2008.  And I am
18  going to show you 2008 through 2014.  Did you get
19  them in 2007?
20    A.  No.  You can't get a year ahead of time.
21    Q.  Did you get quarterly reports in the year
22  2007?
23    A.  Oh, yes.
24    Q.  Did you get them in 2006?
25    A.  Sure.

1     Q.  Did you get them in 2005?
2     A.  Yes.
3     Q.  Did you get them all the way back to
4  1990?
5     A.  My grandmother died in 1976.  She was
6  the original income beneficiary in life estate.  So I
7  think I have them back to third or fourth quarter
8  1976.  She died in July, so technically --
9     Q.  Would you agree with me that since at
10  least 1977, you have been getting quarterly reports
11  that are substantially similar to Exhibit 74?
12    A.  Yes, 1977 would be my first complete
13  year.
14    Q.  For every year since 1977, including the
15  last eight years since 2008, you have gotten a
16  quarterly report.
17    A.  Yes.
18    Q.  And these quarterly reports, at least the
19  one in 2008, which is Exhibit 74, consists of -- for
20  the first quarter, there's 29 pages of information.
21    A.  Correct.  It says 1 of 29.
22    Q.  For the second quarter, there's 31 pages
23  of information.
24    A.  Yes, it always has --
25    Q.  For the third quarter, there's 29 pages of

1  information.
2     A.  Yes.
3     Q.  And for the fourth quarter, there's 29
4  pages of information.
5     A.  Yes.
6     Q.  So it's almost 30 pages or more of
7  information a quarter; right?
8     A.  Around 120 a year, 4 times 30.
9     Q.  So and that information consists of a list
10  of the assets; correct?
11    A.  Yes.
12    Q.  It includes a list of the charges to the
13  trust; correct?
14    A.  Yes.
15    Q.  It lists the sales of any non-real estate
16  assets; correct?
17    A.  Yes.
18    Q.  It lists the transfers between income and
19  principal; correct?
20    A.  Yes.
21    Q.  It lists the cash transactions and noncash
22  transactions; correct?
23    A.  Yes.
24    Q.  And it lists portfolio value and portfolio
25  value by asset class and the income for each

39 (Pages 150 - 153)

1  class; correct?
2  A.  Yes.
3  Q.  In addition to providing other specific
4  information concerning the trust holdings; right?
5  A.  Yes.  The income fee and principal fees of
6  -- they don't show every quarter.  They are usually
7  in a particular quarter, maybe the third or fourth
8  quarter -- or at least the principal fee is.  But I go
9  through each year, each quarter, and pick it up and
10  then the total for that year like I did on the front.
11  Q.  So you have gotten --
12  [WHEREUPON, document is marked Exhibit 75
13  for identification.]
14  BY MR. CORYELL:
15  Q.  Let me show you what we have marked as
16  Exhibit 75.  This is just quarterly statements for
17  2014; correct?
18  A.  Yes.
19  Q.  And again, each one of these statements,
20  it looks like, is at least 30 -- and in some cases --
21  38 pages long; correct?
22  A.  It's in the right-hand corner.  Yeah, here's
23  second quarter, Page 19 of 36.  Fourth quarter,
24  Page 2 of 39.
25

1  Q.  So would you agree with me that these
2  quarterly statements, on average, are at least 30,
3  sometimes a couple of pages more, sometimes a
4  couple of pages less of information concerning the
5  holdings of the William Marshall Bullitt Trust;
6  correct?
7  A.  Yes.
8  Q.  You have gotten those every year for the
9  last almost 40 years; correct?
10  A.  '76 to '16.  24 -- yeah, 42, 41 some years.
11  Q.  Those reports provide 30, sometimes even
12  40 pages of accounting of the assets, income
13  disbursement, expenses, et cetera of the William
14  Marshall Bullitt Trust.
15  A.  Yes.
16  [WHEREUPON, document is marked Exhibit 76
17  for identification.]
18  BY MR. CORYELL:
19  Q.  I am handing you a document we have
20  marked as Exhibit 76.
21      MR. ZIELKE:  What was 75?  I had Exhibit
22  75 as the last one.
23      MR. CORYELL:  75 was the 2014.
24      MR. ZIELKE:  Okay.  I am with you.
25  BY MR. CORYELL:

1  Q.  76 I will represent to you, Mr. Watkins, is
2  just -- it's the cover pages for the quarterly
3  statements from 2009 through 2013.  And we have
4  those.  We have copies of those statements here.
5  A.  All right.
6  Q.  You can look at them if you want.  But
7  would you agree with me that 2009 through 2013
8  are quarterly statements that you received which
9  are substantially similar to 2008 and 2014?
10  A.  How similar?
11  Q.  As far as the information -- the volume of
12  information that you received and the format of the
13  information that you received it and --
14  A.  Yeah, the investments, distributions, bills
15  paid.
16  Q.  You would agree with me that you got that
17  same information from 2009 to 2013?
18  A.  Yes.  Yes.
19  Q.  As we sit here today, do you have any
20  reason to question the accuracy of any of the
21  information that was in the quarterly statements
22  from 2008 to 2014?
23  A.  I am asking for a full accounting by the
24  trustee.
25  Q.  As we sit here today, do you have any

1  information, any reason to question the accuracy of
2  the information that was in any of the statements
3  from 2008 to 2014?
4  A.  I am questioning everything that your
5  client has done, is doing and contemplating doing.
6  Q.  Can you identify anything in any statement
7  from any quarterly statement from 2008 through
8  2014 -- as we sit here today, can you identify
9  anything that you believe is inaccurate?
10  A.  I suspect everything.
11  Q.  No.  But as we sit here today, can you
12  identify anything that you contend is inaccurate in
13  any quarterly statement that you have received
14  from 2008 to the present?
15  A.  Not with particularity.
16  [WHEREUPON, document is marked Exhibit 77
17  for identification.]
18  BY MR. CORYELL:
19  Q.  Okay.  Let me show you some
20  correspondence, a compilation of documents we
21  have marked as Exhibit 77.
22  A.  Correct, 77.
23  Q.  Do you recognize Exhibit 77?
24  A.  It would be in my files.  I am sure I have
25  seen this before.

1  A.  Well, then there it is on 363.
2  Q.  What is your understanding of what 363
3  represents?
4  A.  How the fees rise as the real estate gets
5  valued.
6  Q.  What's your understanding of what those
7  columns are under yearly principal fees?
8  A.  RE is real estate fee on real estate.
9  Equity is -- she broke it down for me -- is the fee
10  on stocks and bonds, investments.
11  Q.  Okay.
12  A.  And then there's the total:  45 plus 10.
13  Well, it's like for 2000 equals 56,818.
14  Q.  Okay.
15  A.  They produced this for me.  I asked for it,
16  but that's the breakdown I wanted to see.
17  Q.  So in your complaint, you allege that the
18  appraised --
19  A.  Exactly.  This is it right here.
20  Q.  You allege that the appraised value of the
21  real property went from 72,000,000 to 131,000,000.
22      MR. ZIELKE:  I object to form.  I am not
23  sure it says that.  I think you are talking about
24  fees.  That's my recollection.
25

1  A.  This is one of my many causes of action.
2  There are several causes of action.  More fees for
3  the trustee, it doesn't improve income for the
4  beneficiaries.
5  BY MR. CORYELL:
6  Q.  I am calling your attention to Exhibit 55.  I
7  am calling your attention to Paragraph 17 of
8  Exhibit 55.  Can you read that into the record for
9  me, please?
10  A.  Despite refusing and neglecting to
11  develop the property which would legitimately
12  increase its value, trustee arbitrarily valued the
13  trust real estate property at $72,000,000, then the
14  next year nearly doubled the value of the same
15  nondeveloped and wasted real estate property to
16  $130,000,000 --
17  Q.  $132,000,000.
18  A.  It says $130 right there.
19  Q.  Go ahead.
20  A.  -- in order to wrongfully increase trust
21  fees without actually developing the land or
22  incurring any additional responsibility or
23  performance under the trust.
24  Q.  What year did that happen?
25  A.  Well, it's -- the first 72 I see is 2004.

1  Q.  That's not the appraised value of the
2  property, is it?
3  A.  It doesn't say appraised value here.
4  Q.  What's it say?
5  A.  Trustee arbitrarily valued the trust real
6  estate property at 72,000,000.
7  Q.  What year did that happen?
8  A.  It says 2004.
9  Q.  I thought you told me that those were
10  fees, not values of the property.
11  A.  PNC produced this, yearly principal fees.
12  Q.  What does your complaint say?  What does
13  Paragraph 17 of the complaint say?
14  A.  Arbitrarily valued the trust real estate
15  property at $72,000,000.
16  Q.  What year did PNC arbitrarily value the
17  trust property at $72,000,000?  Has the trust
18  property ever been valued at $72,000,000?
19  A.  This stops in 2006 here at 44.  No, it's --
20  today?
21  Q.  Has the trust property ever been valued at
22  $72,000,000 as you allege in your complaint?
23  A.  Tamplin appraised it at 93.
24  Q.  Has the trust property ever been valued at
25  $72,000,000 as you allege in your complaint?

1  A.  I don't know.
2  Q.  What's that?
3  A.  I don't know.  That's what it says, but --
4  Q.  It's wrong, isn't it?
5  A.  Maybe.
6  Q.  Has the trust property ever been valued at
7  $131,000,000 as you allege in your complaint?
8  A.  It says 130.
9  Q.  Strike that.  Let me ask the question
10  again.  Has the trust property ever been valued at
11  $130,000,000 as you allege in your complaint?
12  A.  I don't think so.
13  Q.  That allegation is wrong, isn't it?
14  A.  Maybe.
15  Q.  The trust property has never been valued
16  at $72,000,000 and it's never been doubled in one
17  year to $130,000,000, has it?
18  A.  I don't think so.
19  Q.  So you would agree with me that the
20  allegations made in Paragraph 17 of your complaint
21  are incorrect?
22  A.  At the moment it appears so.
23  Q.  And both you and your counsel have
24  represented now that the allegations of that
25  complaint were based on the March 11, 2009 letter

44 (Pages 170 - 173)

1 that you were just referring to, which is part of
2 Exhibit 78 and Bates stamped WAT_362 and 363; is
3 that correct?
4    A.  Yes.
5       MR. ZIELKE:  I object to form.
6 BY MR. CORYELL:
7    Q.  That doesn't show the value of the
8 property, does it?
9    A.  No, fees.
10    Q.  That shows fees, doesn't it?
11    A.  Yes.
12    Q.  That's different than the value of the
13 property, isn't it?
14    A.  Yes.
15    Q.  And those fees and the increase in those
16 fees were based on the increase in the appraised
17 value of the property from 2004 to 2005; correct?
18    A.  Yes.
19    Q.  And the increase in the appraised value of
20 the property was from approximately -- it increased
21 from approximately 23,000,000 to approximately
22 42,000,000; correct?
23    A.  The April of 2007 letter -- what two years
24 did you just mention?
25    Q.  I am asking you.  When did the appraised

1 value of the property go up?
2    A.  Well, it started going up in 1990 --
3    Q.  No.
4    A.  Well, not the appraised value.  From the
5 quarterly reports, it started increasing in 1998.
6    Q.  When did it increase?  It increased in
7 2005, didn't it?
8    A.  Yes.
9    Q.  And that was based on Mr. Tamplin's
10 appraisal, wasn't it?
11    A.  Let's see.  The numbers don't agree.  The
12 quarterly reports increases from 24 to 44,000,000
13 in 2005.  In the 2005 appraisal, 93,000,000.  And
14 two-thirds of 93 is 62.  So I don't know how the
15 bank has 44.
16    Q.  You would agree that the increase in fees
17 that is reflected in this March 2011, 2009 letter is
18 the result of the increase in the appraisal from
19 2004 to 2005; correct?
20    A.  Yes.
21    Q.  And that increase in appraisal was -- the
22 increased appraisal was performed by Mr. Tamplin;
23 correct?
24    A.  Yes.
25    Q.  The valuation that caused the increase in

1 fees was performed by Phil Tamplin; correct?
2    A.  Yes.
3    Q.  And you have a great deal of respect for
4 Mr. Tamplin, don't you?
5    A.  I think he's a good appraiser.
6    Q.  You think he's an excellent appraiser,
7 don't you?
8    A.  A very good appraiser.
9    Q.  So the increase in the appraised value of
10 the property that caused the increase in fees was
11 not in any way arbitrary, was it?
12    A.  It probably was based on his appraisal.
13 [WHEREUPON, document is marked Exhibit 79
14 for identification.]
15 BY MR. CORYELL:
16    Q.  Okay.  Let me show you a document that's
17 been marked as Exhibit 79.  Have you seen this
18 document before?  This is a March 15, 2016 email.
19 It's actually an email from Mr. Tamplin who is the
20 excellent appraiser that you've testified about
21 before to Mr. Couch.
22    And I will represent to you that Mr. Tamplin
23 was forwarding to Mr. Couch a copy of an email
24 that he had gotten from you.  So it's my
25 understanding that the text of this email starting

1 with the words Oxmoor Center all the way down to
2 work for me is actually the text or email that you
3 sent to Mr. Tamplin; is that true?
4       MR. ZIELKE:  Would you say that again?
5 I didn't follow that, Corky.  I am trying to, but it's
6 the second page that it starts; right?
7       MR. CORYELL:  No, that's a different
8 email.
9       MR. ZIELKE:  Oh.  That's why I can't
10 follow with this email.
11       THE WITNESS:  There's no Bates.
12 BY MR. CORYELL:
13    Q.  Look, I am going to ask you about that.
14 Did you send this email to -- did you send an email
15 to Mr. Tamplin that said what this email says, the
16 first page of Exhibit 79?
17       MR. ZIELKE:  I have to object.  I just
18 don't see it.
19       MR. CORYELL:  Larry, Mr. Watkins sent
20 this email.
21       MR. ZIELKE:  It says, from Phil Tamplin.
22 I just don't understand.
23       MR. CORYELL:  I know.  I'm just asking.
24 If he wants to deny it, he can deny it.  We'll
25 cross-examine Mr. Tamplin on it.

1  Q.  Did you say to Phil Tamplin, You are
2  excellent?
3  A.  Yes.
4  Q.  Meaning Phil Tamplin, in your estimation,
5  is an excellent appraiser?
6  A.  Yeah, it says it here.  It was general
7  knowledge about Harry Lewman around town.
8  Q.  You don't have to explain it to me.  He's
9  not related to me.  You can explain it to his --
10  A.  And I know there's reasons I say --
11  Q.  Let me ask you about the second page of
12  Exhibit 79, which is an email to Mr. Tamplin from
13  you and his response, it appears.  Do you see that
14  on the second page of that exhibit?  It looks like on
15  December 29, 2015, you sent Mr. Tamplin an email.
16  I guess it's at the bottom of this page.  Do you see
17  that?
18  A.  Do you mean -- well, how does it start?
19  Q.  Did you do a third-year appraisal of
20  Oxmoor?  A third five-year appraisal of Oxmoor for
21  PNC Bank the Trustee this year?
22  A.  Yes.
23  Q.  Did you send them that?
24  A.  Yes.  That would be 2015.  The first one
25  was '05 and the second one was in 2010.  And PNC

1  says you are supposed to get an appraisal every
2  five years, so that would be 2015.
3  Q.  And he said, Not that I recall; correct?
4  A.  Yeah.  I don't think he was asked to do a
5  2015 evaluation.
6  Q.  Why didn't you produce this document in
7  this litigation?
8  A.  Relevance.
9  Q.  Really?  You decided you weren't going to
10  produce it because you didn't think it was relevant?
11  A.  He didn't end up doing an appraisal.
12  Q.  Are there any other communications, with
13  third parties or anybody else, that you have not
14  produced because you deemed them to be
15  irrelevant?
16  A.  If they don't have anything to do with this
17  case.
18  Q.  So it's your understanding that that would
19  be irrelevant to this case, the second page of
20  Exhibit 79?
21  A.  Asking if he did a third five-year appraisal
22  and he didn't do it, so it's irrelevant.
23  [WHEREUPON, document is marked Exhibit 80
24  for identification.]
25

1  BY MR. CORYELL:
2  Q.  Now, Exhibit 80 is another copy, but a
3  little bit different copy of a document that we
4  looked at earlier.  This is a copy of the March 11,
5  2009 correspondence to you from Harriette Schuler.
6  Are we looking at the same thing?
7  A.  Yes.
8  Q.  Whose handwritten notations appear on
9  Exhibit 80?
10  A.  On 682?
11  Q.  On 682, 683, 684, and 685.
12  A.  Mine.
13  Q.  Are all of those yours?
14  A.  On 684, the middle of the page, In
15  response to your email dated --
16  Q.  Yes.
17  A.  That's not my writing.
18  Q.  To the best of your knowledge, is that Ms.
19  Schuler's writing?
20  A.  It could be because there's her name
21  printed right below that.
22  Q.  Okay.
23  A.  It looks like all of the others are mine but
24  with the exception of the one I just pointed out.
25  Q.  Now, both you and your counsel had

1  represented that this is the document that supports
2  the assertion made in Paragraph 17 of your
3  complaint that the trustee arbitrarily valued the
4  real estate of $72,000,000 and doubled it to
5  $130,000,000 the next year.  This document doesn't
6  establish that, does it?
7  A.  It's the income fees and principal fees.
8  Q.  This document does not say anything
9  about or indicate anything about the value of the
10  property, does it?
11  A.  No, it's fees.  Two different classes of
12  fees.
13  Q.  And the principal fees increased from
14  $72,620,000 in 2004 to $131,681,000 in 2005;
15  correct?  I'm sorry, the real estate fees.
16  A.  2004 --
17  Q.  I'm sorry.  Strike that.
18  MR. ZIELKE:  Maybe that's what
19  happened, Corky.  Maybe that's what happened.  I
20  don't know.
21  MR. CORYELL:  Do you know what?  If
22  that's what happened, then I think you have an
23  obligation to change it.
24  MR. ZIELKE:  To change it.  I understand.
25  I am going to have to look at it.

47 (Pages 182 - 185)

BY MR. CORYELL:

1 BY MR. CORYELL:
2   Q.  So the real estate fees in 2004 were
3 $72,620; right?
4   A.  I agree right there.  It's --
5   Q.  And they increased in 2005 to $131,680;
6 right?
7   A.  Yes.
8   Q.  That's because of Mr. Tamplin's appraisal;
9 correct?
10   A.  I think so.  It nearly doubled.
11   Q.  Yeah, but that appraisal wasn't arbitrary,
12 was it, because it was performed by an excellent
13 appraiser; right?
14   A.  He is a very good appraiser.
15   Q.  Okay.  Were you at Mr. Couch's
16 deposition?
17   A.  Yes, I was.
18   Q.  Do you recall hearing what Mr. Couch said
19 about the appraised value of the property?
20   A.  Not specifically.
21   Q.  So as we sit here today, you cannot
22 identify anything that Mr. Couch said about the
23 appraised value of the property that you believe is
24 inaccurate; correct?
25   A.  I don't recall what he said about

1 appraised value.
2   Q.  And you knew about the increased
3 appraisal of the property from 2004 to 2005 at the
4 time that increased appraisal occurred; right?
5       MR. ZIELKE:  I object to form.
6 BY MR. CORYELL:
7   Q.  Because you reference it in all these
8 letters; right?
9   A.  Yes.
10   Q.  And you were given a copy of the 2005
11 appraisal, weren't you?
12   A.  Yes, there was an increase in --
13   Q.  And you had all kinds of other
14 information.  You were given a copy of the 2005
15 appraisal around 2005, 2006; correct?
16   A.  Yes.
17   Q.  You had all kinds of other information in
18 these reports that showed the increased appraised
19 value of the property; correct?
20   A.  Yes.
21   Q.  And you had -- you were getting quarterly
22 trust statements that showed the increased
23 appraised value of the property; correct?
24   A.  Yes.
25 [WHEREUPON, document is marked Exhibit 81

1 for identification.]
2 BY MR. CORYELL:
3   Q.  Here we go.  Let me show you a document
4 we have marked as Exhibit 81.
5   A.  Thank you.
6   Q.  This is an email from Kendall Dudley to
7 you, I believe; correct?
8   A.  Yes.
9   Q.  Dated October 26, 2006; right?
10   A.  Yes.
11   Q.  So you asked Kendall Dudley in October of
12 2006 about the appraisals on the property; correct?
13   A.  Yes.
14   Q.  And what did she tell you?
15   A.  How the land was carried on the books in
16 her paragraph there.
17   Q.  Well, what she told you is reflected in this
18 email which is exhibit -- what did we call it -- 81;
19 right?
20   A.  Yes.
21   Q.  Do you have any reason to believe that
22 what Ms. Dudley said in Exhibit 81 in her email to
23 you in October of 2006 was inaccurate?
24   A.  Not at this time.
25

1   Q.  As we sit here now, you don't have any
2 reason to believe that it was inaccurate, do you?
3   A.  No.
4   Q.  So you asked Ms. Dudley to provide you --
5 actually, this email string starts out on the second
6 page, doesn't it?  It looks like it starts with an
7 email.
8       MR. ZIELKE:  It looks like hers is 10/26.
9 BY MR. CORYELL:
10   Q.  It looks like it starts with an email --
11   A.  It looks like 10/27 on this page, too.
12   Q.  Can you tell how it starts?  I don't know
13 your email system.
14   A.  I don't know.  There's two different dates.
15   Q.  Well, there's an email.  The first one I
16 see, it looks like it's to -- from you to Kendall
17 Dudley dated October 13, 2006.  It's the one that
18 starts in the middle of Page 1.  What appraisals
19 were ordered, if any, to justify the upvaluing of
20 lands in the ALB and WMB Trusts since 1998?  Do
21 you see that?
22   A.  Yes.
23   Q.  Do you think you sent that email to
24 Ms. Dudley in October of 2006?
25   A.  Yes.

1  Q.  And you said in October of 2006 that you
2  knew that it was upvalued from 1998. It was
3  upvalued to $16,000,000; correct?
4  A.  Yes.
5  Q.  And you told Ms. Dudley that you knew
6  that in 2001 it was at $24,000,000; correct?
7  A.  Yes.
8  Q.  And then you told her that you knew that
9  in 2005 it went to $44,000,000; correct?
10  A.  Yes.
11  Q.  And you asked her what was the reason
12  for that; right?
13  A.  Yes.
14  Q.  And then she responded to that, didn't
15  she?
16  A.  Yes.
17  Q.  And that's in the email above; right?
18  A.  Yes.
19  Q.  And she said, Thank you for your inquiry.
20  There were no appraisals done on the entire
21  Oxmoor property from 1992 until 2005. So it's
22  apparent that the property was undervalued on the
23  book for a number of years; correct?
24  A.  Yes.
25  Q.  You agree with that, don't you?

1  A.  I don't know.
2  Q.  It was valued at $2 for many years, wasn't
3  it?
4  A.  Yeah.
5  Q.  That is undervalued, isn't it?
6  A.  It appears so.
7  Q.  It's my understanding the value in 1998
8  was obtained using existing lease appraisals plus
9  PDA assessment data. Do you have any reason to
10  question the truthfulness of that statement?
11  A.  No.
12  Q.  In 2001, the book value was adjusted but
13  no appraisal on the entire property was made. Do
14  you have any reason to question the accuracy of
15  that?
16  A.  Not now.
17  Q.  In 2001, book value also appears to be
18  below actual market value based on the 2005
19  appraisal. Would you agree with that?
20  A.  Yes.
21  Q.  All of this would result in the
22  beneficiaries paying the trustee less than it would
23  have been entitled if appraisals had been made.
24  Do you agree with that?
25  A.  That's possible.

1  Q.  So the beneficiaries, according to Ms.
2  Dudley, were getting a good deal before 2005;
3  right?
4  A.  Not as far as development is concerned.
5  Q.  With respect to the fees that were being
6  charged based on the property value; correct?
7  A.  Yes.
8  Q.  Then she says, Please feel free to call me
9  if I can be of any further assistance; right?
10  A.  Yes.
11  Q.  Did you call her?
12  A.  No.
13  Q.  Let's take a short break.
14  [WHEREUPON, a brief recess is taken.]
15  [WHEREUPON, document is marked Exhibit 82
16  for identification.]
17  BY MR. CORYELL:
18  Q.  Mr. Watkins, I have handed you a
19  document that we have marked as Exhibit 82. Do
20  you see that?
21  A.  Yes.
22  Q.  I know that there are some documents that
23  we have already looked at that are included in that
24  exhibit, so I won't spend a whole lot of time on it.
25  But the first page of Exhibit 82 is, I know,

1  one that we've already looked at. It's WAT_352;
2  correct?
3  A.  Yes.
4  Q.  The 2005 appraisal that is referenced on
5  that page, is that the appraisal that we have talked
6  about that was done by Mr. Tamplin?
7  A.  It's lot 16.
8  Q.  So that's a different appraisal; correct?
9  A.  This is one lot, lot Number 16.
10  Q.  All right. So that's not the big appraisal
11  that was done by Mr. Tamplin; right?
12  A.  No, it's just one lot.
13  Q.  If you would look at -- I call your attention
14  to Page WAT_0371.
15  A.  Yeah. These numbers don't have -- I see
16  371.
17  Q.  Okay. And if you look at the next page,
18  it's 372.
19  A.  Yes.
20  Q.  So I will represent to you and it
21  appears -- would you agree with me, that these
22  appear to be pages from an account statement, a
23  quarterly account statement?
24  A.  Yes, the end of the third quarter,
25  September 30th.

1    A.   It should be with that.  It's very relevant.
2  The 2005 appraisal is important.  It values this
3  land.
4    Q.   Right.  And you had a copy of that 2005
5  appraisal within a couple of months of that
6  appraisal being completed, didn't you?
7    A.   I don't know how long it took me to get a
8  copy of it.
9    Q.   You had it within a couple of months,
10  didn't you?  You certainly had it within a year.
11    A.   I don't know.  If there is a copy, I think I
12  would have dated it when I got it.
13    Q.   You had it --
14    A.   Whatever their earliest reference may be
15  when I talk about 2005, that would be a key to --
16    Q.   In Exhibit 81, which was the email
17  exchange between you and Ms. Dudley, you
18  reference it, don't you?  At the bottom of the first
19  page of Exhibit 81.
20    A.   I am looking at it.  In 2005, I had 40 --
21  well, that's the bank's number, $44,000,000.
22  That's not Tamplin.  That's the beneficiary report,
23  $44,000,000 when it jumps from 24 to 44 or
24  something.
25    Q.   And by October of 2006, you were aware

1  that the bank was valuing the trust property at --
2  the bank -- what the bank valued the trust property
3  at had jumped from $24,000,000 to $44,000,000;
4  correct?
5    A.   Yes.  I have here 2001 at $24,000,000 and
6  2005 at $44,000,000.
7    Q.   And calling your attention back to Exhibit
8  82 --
9    A.   All right.
10    Q.   -- WAT_354, that was your letter to Mr.
11  Couch.
12    A.   Uh-huh.  Yes.
13    Q.   You reference Mr. Tamplin's 2005
14  appraisal there, don't you?
15    A.   Yeah.  Tamplin Company valued as
16  $93,000,000, so I certainly knew by April of 2007.
17  So sometime between the date of his report, April
18  '05 and --
19    Q.   April of 2007.
20    A.   In that two-year period, I got a copy of it.
21    Q.   Of the 2005 appraisal.  Sometime before
22  April of 2007, you received a copy of Mr. Tamplin's
23  2005 appraisal; correct?
24    A.   I think so, yes.
25  [WHEREUPON, document is marked Exhibit 83

1  for identification.]
2  BY MR. CORYELL:
3    Q.   All right.  Let me hand you a document
4  that we have marked as Exhibit 83.
5    A.   All right.  Yeah, I see a recommendation.
6    Q.   What's so funny?
7    A.   I recommend the Tamplin Company to do
8  the appraisal for 2010.
9    Q.   I thought that was funny, too.  You
10  wouldn't recommend somebody who you thought
11  would attach an arbitrary value to property to do
12  another appraisal, would you?
13    A.   No.
14    Q.   And in Exhibit 83, you recommend that
15  Phil --
16    A.   I thanked --
17    Q.   I'm sorry.  Go ahead.
18    A.   The first line, Thanks for the faxes.
19    Q.   Uh-huh.
20    A.   I do thank people, you know, even in a
21  business relationship.
22    Q.   Sure.  That's considerate.
23    A.   At least part of the time, not a hundred
24  percent.
25    Q.   And you go on to indicate in Exhibit 83,

1  you tell Mr. Couch you know that the next appraisal
2  period is coming up; right?
3    A.   Yes.
4    Q.   Because you know that it's supposed to be
5  done every five years; correct?
6    A.   By previous documents where PNC Bank
7  said, We are going to do this every five years.
8    Q.   Yeah.  Sure.  And you know that it was
9  last done in 2005 and that Tamplin did it; right?
10    A.   Yes.
11    Q.   And that you recommended him to do it in
12  2010; right?
13    A.   Yes.
14    Q.   You told Mr. Couch, do you know what?
15  You can tell him I said so; right?
16    A.   Yes.
17    Q.   Because you want Mr. Tamplin to know
18  that you like him; right?
19    A.   He's a very good appraiser.  I think he's
20  very good.
21    Q.   And you were given a copy of the 2010
22  appraisal; correct?
23    A.   Yes, I have.
24  [WHEREUPON, document is marked Exhibit 84
25  for identification.]

51 (Pages 198 - 201)

1 marked as Exhibit 98. This is a July 3, 2014 email
2 to you from Steve Mercer. Do you see that?
3   A.  Yes, I see it.
4   Q.  You indicate that you wish that you had
5 been invited to the meeting like you were at the
6 previous two. Do you see that?
7   A.  Yes.
8   Q.  So you had been invited to prior meetings
9 with David Nicklies; correct?
10   A.  As I recall.
11   Q.  And Mr. Mercer indicated that no
12 beneficiaries were invited to this particular
13 meeting that you are referring to; correct?
14   A.  Where does it say that?
15   Q.  On the second page you say to Mr. Mercer
16 in an email that you had not produced, I wish I had
17 been invited to this meeting like I was to the
18 previous two. How much has WMB Trust paid Mr.
19 Nicklies? Do you see that now? Mr. Mercer
20 responds to that, doesn't he?
21   A.  No beneficiaries were invited to this
22 meeting. He was just the trust in Nicklies'
23 development.
24   Q.  And then he -- do you have any reason to
25 believe that that is untrue?

1   A.  No, I don't.
2 [WHEREUPON, a brief recess is taken.]
3 BY MR. CORYELL:
4   Q.  We were talking about Exhibit 98, Mr.
5 Watkins.
6   A.  Wait. This says 95 on it, what I have
7 here. Oh, all right. Okay.
8   Q.  In the last, I don't know, seven or eight,
9 maybe even more than that exhibits we talked
10 about were email communications between you and
11 various people at PNC Bank; correct?
12   A.  Yes.
13   Q.  Those were email communications that
14 occurred in 2014; correct?
15   A.  Yes.
16   Q.  And that was after you had actually filed
17 this lawsuit, wasn't it?
18   A.  Yes.
19   Q.  So even after you filed this lawsuit and
20 even after I told your lawyer that any further
21 communications concerning the William Marshall
22 Bullitt Trust or the development of the property
23 should come between the lawyers, PNC continued
24 to provide you with information, didn't they?
25   A.  Maybe some.

1   Q.  They didn't treat you any different. They
2 didn't stop giving you any information even though
3 you had sued them; right?
4   A.  I continued to get the quarterly
5 beneficiary reports.
6   Q.  And you continued to ask questions that
7 were in addition to the quarterly reports; right?
8   A.  Yes.
9   Q.  And they continued to respond to those
10 questions, didn't they?
11   A.  Yes.
12   Q.  And, in fact, you don't have a single email
13 or a single written communication in the last five
14 years where you ask for information and PNC
15 refused to provide it, do you?
16   A.  Maybe. Perhaps.
17   Q.  You haven't produced it, have you?
18   A.  No.
19   Q.  As we sit here today, you cannot identify
20 a single document, a single piece of
21 correspondence, a single email or any written
22 communication where you've ask for information
23 and PNC has refused to give it in the last five
24 years; correct?
25   A.  Maybe.

1   Q.  And that would also be true in the five
2 years -- for the five years before you filed this
3 lawsuit back to 2008; correct?
4   A.  I can't say for sure.
5   Q.  As we sit here today, you can't identify
6 any written communication, email, or other
7 document where you ask for information from PNC
8 and they refused to give it, correct, since 2008?
9   A.  No, not as we sit here today.
10 [WHEREUPON, document is marked Exhibit 99
11 for identification.]
12 BY MR. CORYELL:
13   Q.  All right. Okay. I am showing you -- we'll
14 talk about this afterwards. I am going to show you
15 a document that we have marked Exhibit 99. Have
16 you seen this letter before? This is a letter to you
17 dated April 26, 2016 from Mr. Titus.
18   A.  Yes.
19   Q.  You have seen this letter before, haven't
20 you?
21   A.  Yes, I have.
22   Q.  We're going to designate this document
23 confidential pursuant to the protective order, too.
24 And did you understand that Mr. Titus was writing
25 you as well as the other beneficiaries to discuss

68 (Pages 266 - 269)

1 of Exhibit 100, too; right?
2  A.  Yes.
3  Q.  And did you write down your analysis?
4      THE WITNESS:  Do I have to answer that?
5      MR. ZIELKE:  You can answer that.
6  A.  Yes.
7 BY MR. CORYELL:
8  Q.  How many pages was it?
9  A.  Several.  Three, maybe four.
10  Q.  Did you find anything in Exhibit 100?  Can
11 you identify anything as we sit here today in
12 Exhibit 100 that you disagree with?
13      MR. ZIELKE:  Same objection.  We have
14 not thoroughly gone through all this.
15      MR. CORYELL:  I understand.  I'm saying
16 as we sit here today.
17      MR. ZIELKE:  It takes expert explanation.
18  A.  I am looking for some of the more obvious
19 things to give you an example.
20 BY MR. CORYELL:
21  Q.  Go ahead.
22  A.  Just give me a second.
23  Q.  Please.
24  A.  Thank you. a few things were easier to
25

1 spot.
2  Q.  I am waiting.
3  A.  Other things were a little deeper.
4  Q.  You don't have to explain.
5  A.  Okay.
6  Q.  I'm asking you to identify anything in
7 Exhibit 100 that you disagree with or dispute.
8  A.  There's a distribution made to --
9  Q.  What page are you referring to?
10  A.  Nevermind.  I saw it.  I just can't do it
11 without those notes that I took.  I am sorry.
12  Q.  As we sit here today without the notes
13 that you prepared, you are unable to identify any
14 part of the accounting that you dispute or disagree
15 with; is that correct?
16  A.  That's correct.
17 [WHEREUPON, document is marked Exhibit 101
18 for identification.]
19 BY MR. CORYELL:
20  Q.  Okay.  I am handing you a document that
21 we have marked as Exhibit 101.
22  A.  All right.
23  Q.  There are actually a couple of documents
24 in this document.  The first is -- do you recognize
25 the first, the handwritten document?

1  A.  Yes.
2  Q.  What is it?
3  A.  My grandfather's holographic will.
4  Q.  Okay.  Can you go to where the
5 typewritten --
6  A.  And his testamentary trust.
7  Q.  Sure.  Can you go to where the typewriting
8 portion of the document starts?
9  A.  Page 6, State of Kentucky?
10  Q.  No, the page after that.
11  A.  All right.  Yes.  I, W. M. --
12  Q.  Have you ever seen this document before?
13  A.  Yes.
14  Q.  Have you ever seen the typewritten
15 document before?
16  A.  Yes.
17  Q.  Do you believe that to be a typewritten
18 version of your grandfather's holographic will?
19  A.  Yes.
20  Q.  Let me just ask you, where have you seen
21 the typewritten version?  That's okay.  Do you have
22 some degree -- as long as you have seen it, do you
23 have some degree of confidence that the
24 typewritten version of your grandfather's
25

1 holographic will is accurate?
2  A.  Yes.
3  Q.  Okay.  So --
4  A.  And this one, too.  These were possibly
5 handed out at family meetings.  Maybe my father
6 gave his children copies.  This goes back pretty
7 far.
8  Q.  So we can he agree that the handwritten
9 version is your grandfather's holographic will.  And
10 the typewritten version is just the translation of
11 your grandfather's handwriting.
12  A.  Yes, there's two different type versions.
13  Q.  Where does the other type version start?
14  A.  Let's see.
15  Q.  I see.
16  A.  About the fifth page after I first typed.
17  Q.  Let's do this.  Why don't you take this pen
18 and write at the bottom of the first typewritten one,
19 just write translation one.
20  A.  Okay.  I don't know what typewriter this
21 was on.
22  Q.  I understand.
23  A.  Now, this one, I think this probably came
24 from the old law firm.
25  Q.  Okay.

70 (Pages 274 - 277)

1   A.   This looks like a law firm kind of paper
2   with the lines.
3   Q.   They are the same though; right?
4   A.   Bullitt, Dawson & Tarrent probably did
5   that one.
6   Q.   Who did this one?
7   A.   I don't know.
8   Q.   But you have seen them both?
9   A.   I think I have.
10   Q.   Okay.
11   A.   But this one is more familiar.
12   Q.   Write on the bottom of that translation
13   two.  Are you okay with that?
14   A.   Sure.
15   Q.   You think you have seen both translation
16   one and translation two, but you are more
17   comfortable with translation two.
18   A.   I know this one and the photocopy of the
19   handwritten one.
20   Q.   Fair enough.
21   A.   This other one, probably so.
22   Q.   Fair enough.  You can refer to the
23   handwritten version or either one of the
24   translations if you want.  Item 5 of the
25   grandfather's will --

1   A.   I like translation two better.
2   Q.   That's fine.  I will look at that, too.
3   A.   Yeah.  Item 5.
4   Q.   Yes.
5   A.   Roman Numeral V.
6   Q.   Roman Numeral V, that's the provision of
7   the will that gives you an interest in the Oxmoor
8   Farm property, correct, item V, subpart III?
9   A.   Yeah, two-thirds held in trust for my two
10   daughters, et cetera, and their present children.  I
11   am one of the present children.
12   Q.   And item 6, item VI, which is on the next
13   page --
14   A.   Yes.
15   Q.   What is your understanding of what that
16   provision means?
17   A.   Just what it says.  I will let the document
18   speak for itself.
19   Q.   Do you understand that in item 6 your
20   grandfather, William Marshall Bullitt, has given the
21   trustee of the William Marshall Bullitt Trust
22   absolute power to sell, mortgage or otherwise
23   dispose of the property?
24   A.   Yes.
25   Q.   Is it true that you have referred to

1   yourself as a professional trust beneficiary?
2   A.   I think I have.
3   Q.   Do you remember me taking your
4   deposition?  I think it was in 2012 in the T. W.
5   Bullitt, III -- I am sorry, T. W. Bullitt, II Trust
6   litigation we talked about.
7   A.   Well, I filed in 2007.  I didn't think --
8   that's five years.  I didn't think it went on that
9   long.
10   Q.   Well, I think it was 2012.  It might not
11   have been.  But in that litigation, do you remember
12   me asking you about the other litigation matters
13   that you have been involved in?
14   A.   No, I don't.
15   Q.   Off the top of your head, do you know how
16   many litigation matters you have been involved in?
17       MR. ZIELKE:  I thought you just asked
18   that a couple of hours ago.
19       THE WITNESS:  Well, he wants to ask me
20   if I remember like in that other case.
21       MR. CORYELL:  I will take a current list.
22       MR. ZIELKE:  Why don't you show it to
23   him.
24   [WHEREUPON, document is marked Exhibit 102
25   for identification.]

1   BY MR. CORYELL:
2   Q.   I will show you.  Exhibit 102 is a portion
3   of a transcript of the other litigation.  And you
4   know, Mr. Watkins, I am honestly just trying to
5   short circuit this rather than making you go through
6   and list all the litigation matters that you have
7   been party to, so I will call your attention to Page
8   147.
9   A.   All right.
10   Q.   About halfway down, starting at Line 12,
11   so you have been involved -- I will remind you, if
12   you don't remember, in the other litigation, I had
13   served you with an interrogatory written discovery
14   request asking you to list all the litigation matters
15   that you have been involved in.  And this was at
16   the end of us going through that interrogatory
17   answer.  Okay?
18   A.   All right.
19   Q.   And if you want me to pull out more of the
20   transcript than that, I would be happy to do that.
21   But I am just really trying to summarize.  Okay?
22   A.   Okay.
23   Q.   So what I said, if you look at Page 147,
24   Line 12, You have been involved in seven different
25   litigation matters where you've made claims

Veritext Legal Solutions

800-567-8658                                                      973-410-4040

1 that one -- this is all I can recall.
2  Q.  So I have got five.  I got five before
3 this lawsuit that you filed against a trustee.  Does
4 that sound right?
5  A.  Six or seven.  Maybe it was just six.
6  Q.  And you lost them all.
7  A.  Yes.
8  Q.  And in addition to that, you opposed
9 action that was being taken by the trustee of the
10 William Marshall Bullitt Trust in probate court last
11 year, didn't you?
12  A.  Refresh my memory.
13  Q.  The William Marshall Bullitt Trust was
14 petitioned in court to allow the conveyance of
15 property to LLC.  You opposed that, didn't you?
16  A.  Yes, the Oxmoor something, LLC.
17  Q.  That's a different one; right?
18  A.  All right.  That's fair enough.
19  Q.  So that's seven.
20  MR. ZIELKE:  But that's not a lawsuit.
21 That's just an objection to a petition.
22  MR. CORYELL:  I am asking him for
23 litigation in which he took a position adverse to a
24 trustee.
25  A.  Well, that's fair enough.

1 BY MR. CORYELL:
2  Q.  So that's seven; right?  And then you did
3 the same thing with respect to the Annie Bullitt
4 Trust, didn't you?
5  A.  If it was part of this LLC they are trying to
6 --
7  Q.  It's a separate litigation matter, but you
8 took the same position.  You opposed the trustee,
9 didn't you?
10  A.  All right.  Yes.
11  Q.  So that's eight.  So would you agree with
12 me that there's at least eight different litigation
13 matters you have been involved in in the last 25
14 years where you have taken a position -- you have
15 either sued or taken a position adverse to a trustee
16 or somebody involved in your family's wealth?
17  A.  Okay.  All right.
18  Q.  And you lost them all.
19  A.  Well, this LLC thing, is it still pending?
20  MR. ZIELKE:  One of them is.
21 BY MR. CORYELL:
22  Q.  Well, you lost it in the probate court,
23 didn't you?  It's on appeal; right?
24  A.  Yeah.
25

1  Q.  You haven't won a single litigation matter
2 in which you have opposed a trustee, have you?
3  A.  No.
4 [WHEREUPON, document is marked Exhibit 103
5 for identification.]
6 BY MR. CORYELL:
7  Q.  Okay.  All right.  Exhibit 103, I have only
8 got one copy of this.
9  MR. CORYELL:  I didn't make a copy of
10 this, Larry, because it's so voluminous.
11  MR. ZIELKE:  Why would you say so
12 voluminous?  I mean, everything else you have
13 given us is voluminous.
14  MR. CORYELL:  That's what happens
15 when you don't give information to people.
16 BY MR. CORYELL:
17  Q.  Exhibit 103, have you seen this document
18 before, Mr. Watkins?
19  MR. ZIELKE:  I don't recall us getting
20 that.  I don't recognize it, Corky.
21  MR. CORYELL:  This is a public
22 document.
23  MR. ZIELKE:  It's not in our case, in
24 other words; right?
25  MR. CORYELL:  No.

1  MR. ZIELKE:  I have not seen it and I
2 don't think he's seen it.
3 BY MR. CORYELL:
4  Q.  Calling your attention to -- you are going
5 to have to count it because the pages aren't
6 numbered.
7  MR. ZIELKE:  This is the Mayor's
8 Transportation Plan recently announced.  Is that
9 what this is?
10 BY MR. CORYELL:
11  Q.  I'm sorry.  It's 13 pages in.  It looks like
12 this.
13  A.  Okay.
14  MR. ZIELKE:  You have got it.
15 BY MR. CORYELL:
16  Q.  On the 13th page under Regional Economic
17 Development Project, there's a section there on
18 Oxmoor Farm's bridges and access.  Do you see
19 that?
20  A.  Yes.
21  Q.  There's a description of the Oxmoor
22 Farm's bridges and access.  Have you ever seen
23 that description or were you aware of that
24 discussion?
25  A.  [no audible response]

74 (Pages 290 - 293)