UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

*Electronically Filed*

| | |
|---|---|
| LOWRY R. WATKINS, JR. )<br>)<br>       PLAINTIFF )<br>)<br>v. )<br>)<br>TRUST UNDER WILL OF WILLIAM )<br>MARSHALL BULLITT BY AND )<br>THROUGH ITS TRUSTEE, PNC BANK, )<br>NATIONAL ASSOCIATION, et al. )<br>)<br>       DEFENDANTS ) | CIVIL ACTION NO. 3:13-CV-1113-DJH-CHL |

**TRUSTEE'S MEMORANDUM IN SUPPORT OF MOTION FOR AN AWARD
OF COSTS AND ATTORNEYS' FEES PURSUANT TO KRS 386B.10-040**

Since 1989 Lowry R. Watkins, Jr. ("Plaintiff") has engaged in a pattern of vexatious opposition to the actions of those entrusted with managing the wealth of William Marshall Bullitt, Plaintiff's deceased grandfather. Plaintiff, who describes himself as a "professional trust beneficiary," has made claims against a trustee and/or his family members related to the administration of the Bullitt trusts in at least eight (8) different actions. [*See* 6/14/16 Deposition of Lowry Watkins **[DN 70-2]**, 291-92; Page ID #581]]. PNC Bank, National Association ("PNC") has been targeted in most of those matters. ***Each and every one of Plaintiff's claims has failed.*** [*Id.*]. This case is simply the latest in a demonstrated pattern of frivolous litigation.

PNC is not the only party who has suffered as a result of Plaintiff's litigious antics. Shortly after Plaintiff filed this lawsuit in 2013, his sister, who is also a beneficiary of the William Marshall Bullitt Trust (the "Trust"), sent an e-mail to Plaintiff, pleading with him to

dismiss the case. Ms. Watkins knew that the litigation was groundless, knew that it would be expensive, and feared that it would cost the Trust when it ultimately failed:

> Does your greed have no end? It's now painfully obvious that no decent lawyer in Ky. will represent you and your laughable claims anymore. Zielke's reputation precedes him. (Apparently you weren't aware of this.) Sadly you deserve each other. Lowry, we have at most 15-20 years left (and in who knows what condition). You are totally throwing away not only YOUR money, which could certainly be put to FAR better use, but wasting money in case fees that ALL of us could be using towards our separate interests. The last case you dreamed up cost all of us hundreds and hundreds of thousands in fees, etc.—all to WHAT POINT??? You lost everything, each and every time you appealed all those ridiculous little points. Now you are like a little boy having a temper tantrum because you simply can't get anything that you want or think you deserve. You have lost the respect of your entire family with this endless, USELESS whining. That's what carrying on all these suits are, endless whining in a court of law. You will NEVER, EVER win any of these as they have NO BASIS in fact or law. You keep looking for "evil intensions." Look in the mirror. I am deeply ashamed of your attitude and behaviors. Where and how did my brother go so awry? Porter

[11/12/2013 Porter Watkins e-mail to Plaintiff **[DN 70-13]** (also attached as Exhibit A)].

Ms. Watkins hit the nail on the head. Just as she predicted, significant fees and expenses have been incurred. Specifically, PNC has paid $381,388.08 in attorneys' fees and costs[1] necessary to defend itself against Plaintiff's claims. Under Kentucky law, PNC is now entitled to reimbursement. Pursuant to the prior common law, the Trust would have to pay this bill. In 2014, however, Kentucky enacted the Uniform Trust Code (the "UTC") which empowers this Court to impose that obligation on Plaintiff, instead of the Trust, if "justice and equity" require. KRS 386.10-040. PNC respectfully submits that justice and equity *demand* that Plaintiff be held solely responsible for the attorneys' fees and costs that would have never been incurred had he not filed, and then relentlessly pursued, this vexatious lawsuit. In the event that the Court finds

---

[1] PNC's attorneys' fees and costs were $381,388.08 through August 31, 2017. If Plaintiff resists this motion, or files any other motions, or appeals, those fees and costs will obviously increase. PNC reserves the right to demand, and will demand, reimbursement of all attorneys' fees and costs incurred before and after the filing of this motion.

that Plaintiff should not be held entirely responsible for the attorneys' fees and costs, PNC should be reimbursed for the attorneys' fees and costs from the principal of the Trust.[2]

## BACKGROUND

### A. In November 2013, Plaintiff Filed Stale Claims Regarding the Alleged Lack of Development of Trust Property.

Plaintiff initiated this action four years ago by filing a Complaint in the Jefferson Circuit Court alleging that PNC, in its capacity as Trustee of the Trust, breached its fiduciary duties by failing to pursue certain development opportunities over a sixty (60) year period with respect to real property held by the Trust known as "Oxmoor Farm." Plaintiff claimed that the failure to pursue those opportunities constituted "a willful failure of the Trustee to operate the Trust as would be observed by a prudent man and has caused damages to the Trust and its Beneficiaries including [Plaintiff]." [Complaint **[DN 22-1]**, ¶ 13]. Based on those allegations, Plaintiff asserted claims for failure to perform statutorily prescribed fiduciary duties (Count I); breach of fiduciary duties (Count II); and gross negligence taken in reckless disregard of Plaintiff's rights (Count III) [*Id.* at ¶¶ 24-32].

Plaintiff also asserted that PNC failed to satisfy its duty to provide him with "relevant information about the assets of the Trust." [*Id.* at ¶ 12]. Specifically, Plaintiff complained that PNC failed to respond to a request made "on September 13, 2013 for the Trustee to provide reasons for the lack of development of Oxmoor Farm by the Trustee since 1961…." [*Id.*]. Based on that *single factual allegation*, Plaintiff claimed that he was entitled to receive "a full accounting" of Trust assets (Count IV). [*Id.* at ¶ 34].

---

[2] Simultaneously with its filing of this motion PNC is filing a bill of costs pursuant to FED. R. CIV. P. 54(d)(1), as it is also entitled to recover some of the costs sought herein pursuant to that Rule. PNC is not seeking or demanding a double recovery, but is seeking reimbursement of all attorneys' fees, costs, and nontaxable expenses incurred in its defense of this case pursuant to all applicable authorities.

In addition, Plaintiff alleged that the "Trustee arbitrarily valued the [Oxmoor Farm] property at $72 million, then the next year doubled the value of the same non-developed and wasted Real Estate Property to $130 million in order to wrongfully increase Trust fees…." [*Id*. at ¶17]. In other words, Plaintiff alleged that PNC drove up Trust fees by increasing the assessment of Trust real estate values by $58,000,000. [*Id*. at ¶ 38]. Plaintiff did not provide any specific information concerning the substance or dates of those alleged valuations or identify any documents supporting those figures. Nevertheless, based on that *single factual allegation*, Plaintiff asserted a claim for "unjust enrichment" (Count V). [*Id.* at ¶¶ 36-38].

### B. PNC Removed The Case To This Court And Plaintiff Pursued A Groundless Motion To Remand.

On November 12, 2013, PNC removed this case to this Court on diversity grounds. [*See* Notice of Removal **[DN 1]**]. Nine days later Plaintiff moved to remand the case to state court and for costs. [*See* Motion to Remand **[DN 9]**]. Eight (8) months later, after extensive briefing on the removal issue, the Court denied Plaintiff's remand motion. **[DNs 7, 9, 11, 12, 13]**.

### C. The Court Dismissed Three Of Plaintiff's Original Five Claims On The Pleadings.

PNC then moved to dismiss Plaintiff's original complaint on the pleadings. **[DN 15]**. After extensive briefing the Court ruled that the five-year statute of limitations set forth in KRS 413.120 applied to Plaintiff's claims. [*See* 9/22/14 Memorandum Opinion & Order **[DN 25]** (the "First Dismissal Order"), 3-6]. The Court found that because each of the "development opportunities" identified by Plaintiff occurred more than five years prior to the filing of the Complaint, all of Plaintiff's "failure to develop" claims were time-barred. [*Id.*]. Plaintiff's claim for an accounting—premised *entirely* on PNC's alleged failure to respond to his September 13, 2013 request for information—survived the First Dismissal Order because the Court declined to "examine the adequacy" of PNC's response to Plaintiff at that "preliminary stage" of the

4

litigation. [*Id.* at 7]. Plaintiff's "unjust enrichment" claim also survived the First Dismissal Order because the Complaint provided ***no details*** regarding PNC's allegedly "arbitrary" valuation of the property. [*Id.* at 8].

> **D.    Immediately After Entry of the First Dismissal Order, PNC Requested Plaintiff Voluntarily Dismiss His Remaining Claims Because They Were Demonstrably Untrue.**

By letter dated September 30, 2014, PNC requested Plaintiff voluntarily dismiss the claims that survived the First Dismissal Order. PNC knew that Plaintiff's remaining claims were groundless and the letter explained the basis for that belief. [*See* 9/30/14 Coryell correspondence to Larry Zielke (attached as Exhibit B)]. The letter further indicated that if Plaintiff denied PNC's request and continued to pursue his claims, PNC would seek to recover any and all attorneys' fees and costs at the conclusion of the litigation pursuant to KRS 386B.10-040. [*Id.*].

> **E.    In October 2014, Plaintiff Unsuccessfully Attempted to Revive the Time-Barred Claims Through An Amended Complaint.**

Plaintiff, however, did not drop his remaining claims. Instead, he filed an Amended Complaint and Action for Declaratory Judgment (the "Amended Complaint") in a transparent attempt to plead around the Court's initial dismissal. **[DN 28 and DN 30]**. Specifically, Plaintiff tried to dress the time-barred claims in the clothing of the UTC, claiming that the new statute somehow revived his previously-dismissed claims. **[DN 30, ¶3]**. Plaintiff asserted that his "new" claims were also "based on the [same] facts set out in the original Complaint," which purportedly established that PNC "committed a breach of trust by failing to develop the Trust property…." [*Id.* at ¶ 5].

PNC moved for partial dismissal on the pleadings, seeking dismissal of Plaintiff's "new" failure to develop claims on grounds that they were also time-barred. **[DN 32]**. The Court granted that motion, allowing only Plaintiff's claim for injunctive relief to survive "to the extent

5

that the request for injunctive relief pertains to claims that are not time barred." [9/16/15 Memorandum Opinion & Order (the "Second Dismissal Order") **[DN 54]**, 10]. The only other claim in the Amended Complaint that survived the Second Dismissal Order was Plaintiff's request that the Court appoint a "special fiduciary" to administer a Request for Proposal concerning Oxmoor Farm issued by the Trustee in September 2014 (the "RFP").[3]

Therefore, five out of the nine claims pleaded by Plaintiff in this case were dismissed *on the pleadings*. Only the following four claims survived the Court's two dismissal orders:

1. <u>Count IV, Original Complaint</u> - Right to an Accounting (premised entirely upon the allegation that PNC failed to respond to Plaintiff's September 13, 2013 email);

2. <u>Count V, Original Complaint</u> - Unjust Enrichment (premised entirely upon the assertion that PNC arbitrarily increased the value of the property from $72 million to $130 million in order to increase Trust fees);

3. <u>Count VIII, Amended Complaint</u> - Injunctive Relief (to the extent it pertains to claims that are not time barred); and

4. <u>Count IX, Amended Complaint</u> - Appointment of Special Fiduciary to Administer the Oxmoor Farm RFP.

**F.     Discovery Proceeds For Two Years And PNC Moves For Summary Judgment.**

Discovery commenced and for two years the parties litigated these four claims. During this period Plaintiff served three sets of broad, all-encompassing, interrogatories and requests for documents. PNC answered *all* of his requests, and provided the comprehensive production he demanded. In total PNC produced 2,048 documents, consisting of 14,220 pages. [See Affidavit of Cornelius E. Coryell, II (attached as Exhibit C), ¶ 20]. Plaintiff also deposed Jim Couch, the Trust's real estate manager.

---

[3] Plaintiff never pursued appointment of the requested "special fiduciary," and the claim was dismissed by the Court on summary judgment.

PNC deposed Plaintiff on June 14, 2016. Not surprisingly, Plaintiff's deposition testimony demonstrated that *all* of his remaining claims were groundless and failed as a matter of law. Specifically, Plaintiff candidly acknowledged that the allegations concerning the valuation of Oxmoor Farm were flatly wrong and based on his misinterpretation of a letter that he received from PNC in March 2009. [Watkins Depo. **[DN 70-2]**, 173; Page ID# 572]. He further admitted that his September 13, 2013 request for information—the only alleged request for information to which PNC allegedly failed to respond—was merely a pretense, intended to "get some information to give to Mr. Zielke to put in [his] lawsuit…." [*Id.* at 56-57; Page ID# 554]. Moreover, contrary to Plaintiff's contention, PNC promptly responded to that request offering to provide Plaintiff with any specific information he desired. [*Id.* at 61; Page ID# 555]. Based on Plaintiff's deposition admissions, PNC filed its motion for summary judgment on Plaintiff's remaining claims on July 13, 2016—almost immediately after receiving the transcript of Plaintiff's deposition. **[DN 70 and DN 71]**.

### G. Plaintiff Tries To Recast His Case Into Something New, Long After The Amendment Deadline Passed.

Knowing that his deposition testimony doomed his four remaining claims, Plaintiff desperately tried to transform this case into a brand new lawsuit, with brand new claims, *months after* the deadline for amending the pleadings had already passed. His first maneuver was to file a motion on July 12, 2016 to "clarify" his Complaint. This motion, of course, was a poorly-disguised motion for leave to amend, which Plaintiff dressed in the clothing of "clarification" because he knew that the amendment deadline had passed eight months earlier. **[DN 69]**. The motion was fully briefed and subsequently denied. **[DNs 69, 74, 77, 78, 86, 110]**.

Plaintiff's next maneuvers were premised upon a trust administration issue having nothing whatsoever to do with his pending claims. Specifically, in April 2016, PNC determined

7

that certain Trust expenses were classified as income expenses instead of principal expenses. **[DN 72-3]**. Immediately thereafter, PNC identified the issue to all Trust beneficiaries, including Plaintiff, and completely corrected the classification of those items at no cost whatsoever to *any* of the beneficiaries. [*Id.*]. Not surprisingly, Plaintiff seized the opportunity to launch a new discovery blitz, hoping that additional discovery would unearth evidence of wrongdoing that simply did not exist and provide a way to escape summary judgment.

Plaintiff's discovery effort was intense. Specifically, on July 28, 2016, Plaintiff filed a motion to compel PNC to provide responses to interrogatories and requests for production of documents for the timeframe of November, 1991 to the present, even though this Court had already ruled that all of his pre-2008 claims were time-barred. **[DN 72 and DN 73]**. That motion was extensively briefed. **[DNs 72, 73, 79, 83]**. Plaintiff also moved to hold PNC's motion for summary judgment in abeyance—a motion that was also extensively briefed. **[DNs 87, 88, 89, 90]**. Plaintiff then twice moved to compel deposition dates, privilege logs, and documents in connection with discovery having nothing to do with his pending claims. These motions were also fully briefed. **[DNs 92, 108, 111, 112]**. Plaintiff deposed PNC employee Alan Titus and former PNC employee Steve Mercer, and demanded the depositions of numerous other PNC employees. **[DN 87-1]**. After coordinating with those individuals, PNC provided proposed deposition dates for each, but Plaintiff never scheduled those depositions.

Seven months *after* PNC moved for summary judgment, and more than a year and four months *after* the deadline to amend pleadings passed, Plaintiff *again* moved for leave to amend his complaint. **[DN 97 and DN 98]**. Incredibly, his proposed Second Amended Complaint abandoned all of his previously-pled claims, and set forth brand new claims allegedly arising entirely out of his post-summary judgment motion discovery. **[DN 97-1]**. Essentially, Plaintiff

8

asked the Court to allow him to abandon his pending groundless lawsuit and move on to his next groundless lawsuit without having to file a new Complaint or filing fee. That motion was also extensively briefed. **[DN 97, 98, 101, 104]**.

As if that were not enough, Plaintiff then filed *another* motion to compel on March 31, 2017. **[DN 108]**. That motion—Plaintiff's third motion to compel—was also fully briefed. **[DNs 108, 111, 112]**. Plaintiff followed that with a patently improper subpoena seeking confidential information from PNC's former appraiser George Chapman. PNC requested that Plaintiff withdraw the subpoena, but Plaintiff refused, thereby forcing PNC to file a motion to quash. That motion was also fully briefed. **[DNs 113, 116, 118]**.

### H. The Court Correctly Denies All Of Plaintiff's Pending Motions And Grants PNC's Motion For Summary Judgment.

On August 28, 2017, the Court issued a Memorandum Opinion and Order, followed by a Judgment, ruling on all of the pending motions. [*See* 8/28/17 Memorandum Opinion & Order **[DN 120]** (the "Summary Judgment Opinion") and Judgment **[DN 121]**]. Specifically, the Court (1) denied Plaintiff's motion to stay PNC's summary judgment motion, (2) denied Plaintiff's motion for leave to file a second amended complaint, (3) denied Plaintiff's latest motion to compel, (4) granted PNC's motion for summary judgment on Plaintiff's remaining claims, and (5) denied all other motions as moot. [*Id.*]. Thus, *all* of Plaintiff's claims have now been ruled groundless as a matter of law. Five of his nine claims were disposed of on the pleadings, and the four that survived to discovery were dismissed on summary judgment.

Unfortunately, addressing Plaintiff's baseless claims and related motions—some of which this Court recognized to be a "stall tactic"[4]—was an expensive task. Pursuant to Kentucky law, PNC was required to initially pay *all* of its attorneys' fees and costs. PNC has not

---

[4] Summary Judgment Opinion **[DN 120]**, p. 6.

used *any* Trust funds to defend itself in this case. But, now that all of the claims have been dismissed, Kentucky law provides that PNC is entitled to reimbursement from Plaintiff or the Trust. This Court is now charged with deciding who should pay. PNC respectfully submits that Plaintiff is the one who should pay, as there simply would have been no fees and costs had he not filed and aggressively pursued yet another groundless lawsuit against PNC. To the extent that the Court finds that Plaintiff is not solely responsible for all such fees and costs, PNC respectfully submits that the Trust should reimburse PNC for all fees and costs that Plaintiff is not required to repay PNC.

## ARGUMENT

I. **PNC IS ENTITLED TO REIMBURSEMENT OF THE COSTS AND ATTORNEYS' FEES INCURRED DEFENDING PLAINTIFF'S CLAIMS.**

This Court has held that when a trustee is sued for alleged wrongdoing, it should not pay its attorneys' fees out of the trust. If, however, the trustee successfully defends its actions, the trustee should be reimbursed its fees and costs at the conclusion of the lawsuit. *See*, *e.g.*, *Sierra v. Williamson*, 784 F. Supp. 2d 774, 776 (W.D. Ky. 2011), *Salmon v. Old National Bank*, 2010 WL 1463196, at *2 (W.D. Ky. 2010).

Prior to the 2014 enactment of the UTC, trustees who successfully defended themselves against an action by a beneficiary generally sought recovery of their fees from the trust corpus. *See, e.g.*, *Sierra*, 784 F. Supp. 2d at 776-77. Now, however, the UTC specifically and explicitly empowers a court to order that the trustee be reimbursed by the trust *or another party*—such as an unsuccessful plaintiff—as equity and justice require:

> In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

KRS 386.10-040.

Here, it cannot be reasonably disputed that PNC should be reimbursed the $381,388.08 in attorneys' fees and costs that it incurred in defending Plaintiff's baseless claims. That is a given. As Judge Russell noted in *Sierra*, "[w]hen the trustee's administration of the assets is unjustifiably assailed it is a part of his duty to defend himself, for in doing so he is realizing the settlor's purpose." 784 F. Supp. 2d at 777. The trustee's recovery of fees and costs "is warranted where the trustee [is] not at fault in the litigation and the amount of attorney expenses was reasonable." *Id.* Here, PNC was not at fault in the litigation, and the amount of attorney expenses was reasonable given the scope and ferocity of Plaintiff's attack.

### A. The Attorneys' Fees And Costs At Issue Are Reasonable.

PNC seeks to recover its attorneys' fees and costs pursuant to KRS 386B-10.040. Where an award of attorney fees is authorized by statute, "the trial court's decision should be guided by the purpose and the intent of providing an award of attorney fees and costs under the particular statute." *Alexander v. S & M Motors, Inc.*, 28 S.W.2d 303, 305 (Ky. 2000). "[T]he reasonableness of the claimed fee is for the trial court to determine, subject only to an abuse of discretion." *Young v. Vista Homes, Inc.*, 243 S.W.3d 352, 367 (Ky. App. 2007).

While there is not yet any Kentucky case law announcing the purpose and the intent of KRS 386B-10.040, its twofold purpose is obvious: (1) to provide a trustee who defeats groundless claims reimbursement of its attorneys' fees and costs, and (2) to provide the Court with flexibility to require those fees and costs "be paid by another party or from the trust"— whichever justice and equity require. Since the primary goal of KRS 386B-10.040 is reimbursement of the trustee, the measurement of "reasonable" fees is simple—it is the amount the trustee actually paid to defend itself against groundless claims. Here, over the course of

nearly four years of litigation, PNC paid $381,388.08 in attorneys' fees and costs to successfully defend itself against Plaintiff's groundless claims.[5]

### 1. The Hourly Rates Were Reasonable.

Plaintiff cannot seriously challenge the reasonableness of PNC's attorneys' hourly rates. First, PNC's attorneys charged rates that are entirely consistent—if not below—the market rates of attorneys in Louisville, Kentucky with similar education and experience. In fact, PNC's attorneys' hourly rates for work in this case are substantially less than the hourly rates normally charged by Plaintiff's counsel. In 2009, Plaintiff's counsel filed a motion for fees in another case pending in this Court, indicating that Mr. Zielke's billable rate was $300 per hour. Nancy Schook, who was also counsel of record for Plaintiff for the first two years of this case, billed at $280 per hour for work performed in December, 2008. [*See* 1/13/09 Zielke Attorney Fee Statement filed in *Brewer Machine & Conveyor, Inc. v. Old National Bank*, Case No. 4:08-cv-00143-JHN-ERG (attached as Exhibit D)]. In contrast, the average billing rate of PNC's lead counsel in this matter, Cornelius E. Coryell, has been $274.76 per hour. [*See* Exhibit 1 to Coryell Affidavit]. And with the exception of senior partner Leo Camp, whose 5.7 hours of work on this case was billed at an average rate of $336 per hour, all other PNC attorneys and paralegals billed at rates far lower than what Plaintiff's counsel charged in 2008. [*Id.*]. Plaintiff cannot complain about the rates of PNC's counsel when Mr. Zielke and his firm charged higher rates nine years ago.

---

[5] Attached as Exhibit C is an affidavit of Cornelius E. Coryell, lead counsel for PNC, supporting PNC's fee claim. Specifically, the affidavit sets forth (a) the names and backgrounds of the attorneys and paralegals who worked on the case, (b) their billing rates, (c) the numbers of hours billed to, and paid by, PNC in this case, and (d) PNC's costs. The affidavit and its exhibits confirm that the attorneys' fees and costs charged in this case were reasonable.

## 2. The Hours Spent On The Case Were Reasonable.

The hours PNC's counsel spent on this litigation were also reasonable. In fact, most of the time spent defending this case was prompted by the need to respond to Plaintiff's three sets of extraordinarily broad discovery requests, his numerous requests for depositions, and his seemingly endless parade of motions—starting with his groundless motion to remand, followed by three motions for leave to amend, and ending with his last of many rejected motions to compel. Put simply, Plaintiff forced PNC to play a four-year game of legal whack-a-mole: every time PNC would knock down one of Plaintiff's claims or motions, Plaintiff would set up another one and force PNC to knock it down. The Court needs look no further than the docket sheet for confirmation of this fact. In total there were ***119 filings*** before the Summary Judgment Opinion that brought a close to this case. At least thirty-seven of those filings were substantive briefs.

If that were not enough, Plaintiff propounded all-encompassing discovery. Even though PNC's production was limited to the time-period of 2008 forward—a limitation Plaintiff constantly challenged—PNC produced 2,048 documents, consisting of nearly 14,220 pages. [Coryell Affidavit, ¶ 20]. And many more documents had to be gathered, organized, and reviewed for relevancy and privilege by PNC's counsel and paralegals in order to make the proper production. In addition, PNC's attorneys and paralegals analyzed over 2,000 pages of documents produced by Plaintiff. [*Id.*]. And after all of that, PNC had to prepare two successful motions to dismiss and one successful motion for summary judgment. PNC's lawyers successfully performed all work in this case as efficiently and effectively as possible. Now, having successfully defended itself, PNC is entitled to have its attorneys' fees and costs reimbursed in full.

### B. Plaintiff Should Be Required To Personally Reimburse PNC All Of Its Attorneys' Fees And Costs.

The only question before this Court is whether "justice and equity" require PNC's fees and costs to be paid by the Trust or by Plaintiff. PNC respectfully submits that Plaintiff should be required to foot the entire bill. The Trust has a number of beneficiaries other than Plaintiff. *None* of those beneficiaries joined Plaintiff in this lawsuit. They are innocent bystanders to, if not victims of, Plaintiff's long parade of groundless attacks against trustees. Ms. Watkins' e-mail at the outset of this case eloquently captures why justice and equity demands that Plaintiff pay all fees and costs now at issue instead of the Trust. **[DN 70-13**, also Exhibit A hereto]. Ms. Watkins predicted exactly what would happen and pleaded with Plaintiff not to continue. Regrettably, her request fell on deaf ears.

Had Plaintiff not filed this groundless case, *or* had he taken his sister's sage advice to drop it, *or* had he accepted PNC's September 30, 2014 offer to walk away from its fee and cost claim after the First Dismissal Order, there would be no attorneys' fee or cost claim to decide. But Plaintiff refused to listen. He instead opted to pugnaciously pursue his meritless claims for nearly four years, never once passing up an opportunity to file a motion, make a discovery request, or serve a subpoena that ultimately served no purpose other than to drive up litigation costs. Now that the case is over, justice and equity demand that PNC be reimbursed its attorneys' fees and costs, and that Plaintiff *alone* be charged with that responsibility.

Moreover, Plaintiff cannot complain that he is unable to pay $381,388.08 in attorneys' fees and costs, and that the requested relief is therefore inequitable. It is undisputed that Plaintiff has the means whereby he can easily reimburse PNC the attorneys' fees and costs at issue. Records showing what Plaintiff has received each and every month from the Trust from 2008 through 2016 is included in Trust statements filed in the record under seal. [**[DN 70-11]**, Bates

Nos. 9215-9217]. Given the amount of Plaintiff's income from this Trust alone it certainly is not inequitable to require him to pay the fees and costs flowing from his latest groundless attack on the Trustee.

**C.     The Reimbursement Should Be Secured By Plaintiff's Monthly Income Distributions From The Trust.**

Finally, given Plaintiff's proclivity to litigation, stall tactics, and his obvious dislike of trustees, it is likely that Plaintiff will vehemently resist any order requiring him to reimburse PNC. Accordingly, PNC respectfully requests an order that not only requires Plaintiff to pay PNC its attorneys' fees and costs in a lump sum, but also states that if he fails to do so, (1) interest will accrue on the amount at Kentucky's legal rate of six (6) percent per year, compounded annually, and (2) that PNC is authorized to collect the debt from future Trust income distributions to Plaintiff until the debt is fully satisfied (in addition to exercising any other collection and execution mechanisms available to PNC). In other words, PNC asks this Court for a lien on Plaintiff's future income distributions from the Trust until his debt is paid in full, as this is perhaps the easiest and most efficient way to secure PNC's reimbursement.

**D.     The Trust Should Be Responsible For Any And All Costs and Fees That Are Not Plaintiff's Responsibility.**

To the extent this Court does not find that it is just or equitable for Plaintiff to be personally responsible for any portion of the attorneys' fees and costs that PNC incurred in defending itself against Plaintiff's groundless claims, justice and equity demand that the Trust reimburse PNC those fees and costs. PNC successfully defended and fulfilled the settlor's purpose by winning this case, and it not be required to personally bear any of the expenses and costs of this case. As between PNC and the Trust, the Trust is the proper payee, and if Watkins does not foot the entire bill for the defense of this case, the Trust should pay whatever Watkins

does not pay. And to the extent the Trust is held liable for any of the attorneys' fees and costs at issue, those fees and costs should be charged to Trust principal.

## **CONCLUSION**

Kentucky law provides that PNC should be reimbursed the reasonable attorneys' fees and costs it incurred in defending itself against Plaintiff's groundless claims. PNC now respectfully requests that reimbursement pursuant to KRS 386B.10-040. That statute holds that this reimbursement should be made by a party to the case, or the Trust, as "justice and equity" require. PNC respectfully submits that justice and equity require that Plaintiff alone be required to make this payment. Either way, however, PNC should be immediately reimbursed, and it respectfully asks this Court for an order providing it full reimbursement of its costs and attorneys' fees from the source that the Court, in its discretion, deems to be the appropriate one.

<div style="margin-left:50%">

Respectfully submitted,

*/s/ Christopher W. Brooker*
Cornelius E. Coryell II
ccoryell@wyattfirm.com
Christopher W. Brooker
cbrooker@wyattfirm.com
Allison L. Brown
abrown@wyattfirm.com
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky 40202-2898

*Counsel for PNC Bank, National Association as Trustee of the Trust Under Will of William Marshall Bullitt*

</div>

**CERTIFICATE OF SERVICE**

   I hereby certify that on September 11, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Laurence J. Zielke
Janice M. Theriot
Zielke Law Firm, PLLC
Suite 1250 – Meidinger Tower
462 South Fourth Street
Louisville, KY  40202

*Counsel for Lowry R. Watkins, Jr.*

          */s/ Christopher W. Brooker*
          *Counsel for PNC Bank, National Association as*
          *Trustee of the Trust Under Will of William Marshall*
          *Bullitt*

61662670.3